THE UNITED STATES *vs.* ROBERT B. NELEIGH.

1. A paper purporting to be a grant of land in California first produced from the custody of a claimant after the war, and unsustained by any record evidence, will not be held valid by this court.

2. Evidence of the destruction of archives during the war does not avail the holder of such a naked grant unless he can show where and how the specific papers necessary to complete his title were lost or destroyed.

3. The court again affirms the doctrine that the testimony of Mexican officials cannot be received to supply or contradict the public records.

4. The theory of claimants has been that the want of archive evidence should be excused on the ground that many of the records were lost or destroyed; but the records of the Mexican Government in California being found in tolerable preservation, and the most enormous frauds having been attempted on the assumption that this theory would account for their non-production, the court has been compelled to reject it as altogether fabulous.

5. A grant not recorded, and for which no espediente is found, and which is not among the forty-five sent in to the Departmental Assembly and confirmed on the 8th of June, 1846, cannot be believed genuine on the testimony of a Mexican Secretary, who swears that he signed and delivered it.

The appellee in this case claimed under the title of José Castro, which was rejected by the Supreme Court at Decem-

ber term, 1860, (24 How., 347.) Neleigh and one McKenzie purchased from Castro in 1849 six of the eleven leagues covered by his title, "to be selected whenever the same shall be located by the proper authority." McKenzie died soon after the purchase, and Neleigh, by a conveyance from his widow, under a power in his will, became possessed of his interest in the land. He presented his petition to the Land Commission in September, 1852, asking a confirmation of title to his six leagues, and in March, 1853, Castro petitioned in his own name for a confirmation of the remaining five. The reasons for the rejection of Castro's title, which reached the Supreme Court first, are set forth very fully in the opinion of the court delivered in that case by Mr. Ch. J. *Taney.* Neleigh's claim, after an adverse judgment in the Land Commission, was confirmed by the District Court in October, 1859. From this decree the United States appealed.

No new title-papers were offered. The claim rested in this case, as in that of Castro, upon the naked grant produced from the custody of the claimant. But much additional parol testimony was taken, by which it was sought to distinguish the new case from the old. Four new witnesses, including Pico and Moreno, whose signatures were appended to the grant, were called to prove its genuineness. Some additional evidence of occupation was offered, and the testimony of Col. Fremont introduced to show that he had lost a portion of the archives in the mountains of San Juan—among them papers relating to a title to Gen. Castro. A witness was called to show that there was but one Gen. Castro in California in 1846, thereby connecting the lost papers with the title of the present claimant. On the part of the United States no evidence was added to that offered in the case of José Castro.

*Mr. Shunk,* of Pennsylvania, for the United States. There is no espediente, note, or other record of this grant in the Mexican archives, and the case rests upon a naked paper produced from the pocket of the claimant in 1849. This objection is fatal. But there is positive historic evidence besides, which proves the paper offered as a title to be fraudulent and ante-

dated. It claims to have issued on the 4th of April, 1846. It
is a historic fact, that at that date Pio Pico and José Castro
were at open war. The journals of the Departmental Assem-
bly show that they were. Moreno in his testimony in this
very case admits the fact, and adds to it the statement that in
the spring of 1846 Pico set out with an armed force to drive
Castro from the country. Castro asserts in his deposition that
during the administration of Pico he recognised no power in
California superior to his own, save that of the Supreme Gov-
ernment. He testified his contempt for Pico by seizing the
custom-house at Monterey, and withholding from him the
public revenues. Yet we are asked to believe that Pico made
a grant to this vexatious rebel of eleven square leagues of land
just on the eve of a military expedition intended to drive him
beyond the bounds of the Department. Such a grant at such
a time, considering the angry relations of the parties, is simply
incredible.

But the paper produced as a title is fraudulent on its face.
Pico styles himself, at its commencement, " Constitutional
Governor of the Department of the Californias." He bore
no such title at the date of this grant, nor did he lay claim
to it. The journals of the Assembly show that he did not
receive his appointment as Constitutional Governor until
the 15th of April, 1846, and was not inaugurated until the
18th. The first grant made by him, in which he assumed
his new title, was that to Pedro Sansevaine, dated April 21st,
1846. In every title issued between the time that he became
Governor by virtue of his position as First Vocal of the Assem-
bly in February, 1845, and the date of his inauguration as
Constitutional Governor in April, 1846, he styles himself,
"First Vocal of the Departmental Assembly and Governor *ad
interim* of the Department of the Californias." Castro's grant
is the only exception to this rule. To accept it as genuine we
must believe that Pico, without any conceivable reason, and
in this solitary instance, assumed a title to which he had no
claim, and recited an appointment which he had not received.
But it is easy to conceive, if we adopt the theory that this is an
ante-dated paper, that Pico, years after the conquest, in concoct-

ing an ante-dated grant, should forget which of his two titles he was in the habit of using at the time of the false date, and stumble on the wrong one. We have his own word for it in this case, that he had forgotten when he became Constitutional Governor. We have, besides this, the admission of Moreno, that he did not sign the grant until May, although it pretends to have issued in April. It is, therefore, a paper entirely unsupported by archive evidence, contradicted by history and the public records, fraudulent on its face, and ante-dated by the admission of the officers who made it.

The only occupation proved in this case is a military occupation in 1844, two years before the date of the pretended grant, and which lasted but a few months, and a settlement made in 1849, after the discovery of gold had made the land a tempting prize for speculation and fraud.

There is nothing to distinguish Neleigh's case from that of José Castro, except that the fraud only suspected by the court in the one case is made absolutely plain in the other.

*Mr. Reverdy Johnson*, of Maryland, and *Mr. Gillet*, of Washington, for the appellee. The absence of the espediente and other record evidence in this case is accounted for by the testimony of Colonel Fremont. Papers relating to a title to General Castro were lost among the mountains. We cannot be expected to produce records the loss of which we have plainly and directly proved. Moreover, the grant recites that all the necessary steps required by law as preliminaries to a grant have been taken. Recitals in a grant by a public officer are *prima facie* evidence of the fact recited when they relate to the subject-matter of the grant. *Fremont's Case*, (17 How., 558;) *Reading's Case*, (18 How., pp. 8, 9;) *Peralta's Case*, (19 How., 343;) *Doe vs. Wilson*, (23 How., 457.) The recording of titles granted being the duty of the officer after the grant was made, if omitted by him cannot defeat the title of the grantee, nor create a suspicion against it. If the neglect of the Governor to remit the papers of a grantee to the Assembly for confirmation could not defeat or affect the rights of a grantee, as has been held by this court, *Reading's Case*, (18 How., p. 7,) certainly a similar neglect

to record or preserve papers could not defeat or affect him. When a grant is once made, it can only be defeated by the act or omission of the grantee, and no default of a public officer can change his rights or subject them to a doubt. The grantee was entitled to receive the grant and retain it, and this is evidence in favor of his title until overthrown by proof by those questioning it. The grant itself is not *secondary* but *original* evidence, and the best within the power of the party to produce. It has always been held that the production and proof of what purported to be an original grant made by an authorized official was sufficient, and no additional record evidence from the archives was held to be necessary, but whoever sought to defeat the effect of this *prima facie* evidence must do so by competent legal proof. Moreover, this case conforms to the propositions laid down in *Castro's Case*, (24 How., 347,) in relation to the introduction of secondary evidence. The record shows that at a former time there was a grant recorded in the usual manner in the Secretary's office; that some of the books and papers have been lost and destroyed; that there was actual possession within reasonable time, and a survey by the owner, and that this actual possession was as early as Fremont's, was delayed for the same reason, and the want of a plat and judicial action in making a survey excused in the same way. The case differs widely from that of Castro both in the amount of the testimony and the matters to which it relates. The court cannot reject this claim without repudiating a long line of decisions which have come to be regarded as the law of the land.

*Mr. Black*, of Pennsylvania, in reply. The title, properly so called, and the written documents connected with it, are in precisely the same condition now that they were in when this court examined them before in the case of *The United States* vs. *Castro*. It is a naked grant, without an espediente found among the archives, and without record evidence of any kind to show that it ever was issued or even applied for. This court has decided in certainly not less than twenty-five cases that such a title cannot have its approval. With the exception of the one judge whose commission is dated during the present term, every

member of the court has committed himself and his brethren in his own language against the confirmation of such claims. If the ingenious arguments of the claimant's counsel, that recitals are evidence, that records are lost, that grantees must not be affected by the omissions of public officers, were new, we might reply to them at length, but they have been made and answered and overruled a score of times already, and the process need not be repeated again.

The decision in Castro's case is conclusive on the court as a judicial precedent from which there can be no departure with safety. It is also technically binding as a determination of the same question between the same parties or their privies.

But, passing that, what is the value of the additional evidence found upon this record? Does Moreno add anything even to the moral strength of the case? He is notoriously unworthy of belief. Pico's testimony is on the face of it false. Colonel Fremont is, of course, incapable of making a wilful misstatement; but what does he say? That he lost papers in the mountains, and one of them, he thinks, had reference to a title of General Castro's. But whether it was a title for eleven leagues or one league, for land on the San Joaquin or the Sacramento, in Upper or in Lower California, he does not pretend to know; nor does he say whether the paper he saw was a petition, an informe, or a grant; whether it was signed by Figueroa, by Alvarado, Micheltoreno, or Pico, or by anybody at all. It is preposterous to make a title out of such evidence as this, even if parol evidence were, under any circumstances, admissible.

But there are three facts in this case which were not shown to the court by the record in Castro's case, and which do prove most incontestably that the grant is a mere fabrication. These facts are: 1. That at the pretended date of the grant, Castro was in rebellion against the authority of Pico. 2. That it is attested by a person, as Secretary, who at that time was not Secretary. 3. That it purports to be made by Pico as Constitutional Governor at a time when he had not assumed the duties or the title of that office.

Each one of these facts considered separately would make

it extremely improbable that a grant was made to Castro on the 4th of April, 1846. Men in office do not bestow such favors or any favors at all upon their enemies and the enemies of the Government they represent. Pico and Castro were not then in communication. No petitions passed between them. Castro refused to acknowledge Pico as Governor, and he was known to Pico only as an insolent disturber of the public peace, and a robber of the public money. They addressed one another only in the language which could be uttered from the mouths of their muskets. To find a paper signed or countersigned by an officer who, upon investigation, appears not to have been in office at the time, would anywhere be regarded as about the strongest evidence of forgery that could be produced. When you see that the Governor who makes the grant is described as holding an office which he did not hold at the time, and speaking in a style totally different from that used in all cotemporaneous documents, you are forced to the conclusion that the paper was not made when it bears date.

But it is a rule of circumstantial evidence, which the good sense of every reasonable man approves, that the force of independent criminating facts does not depend so much on their weight as on their number. If you have two, consider them separately, and they may not weigh a feather; but unite them together, and they press upon the accused with the weight of a mill-stone. Two or three such facts as these, each independent of the other, could not exist by chance in the case of an honest grant. In a charge of murder it is *suspicious* to find the knife of the accused party lying near the body of the victim. It is *demonstration* if the purse of the deceased be found in possession of the same person. If, in addition to this, the party who owned the knife, and had the purse, was seen with bloody hands running away from the place of the murder about the time it was committed, *who could stand up* to defend him?

The want of evidence in this case makes it bad enough for the claimant—bad enough to insure the rejection of the claim. But when you see that it is also demonstrated to be a fraud by circumstantial evidence so irresistibly strong as that which ap-

pears on this record, there is no room left for doubt, nor no grounds for an argument.

Mr. Justice GRIER. Neleigh filed his claim before the board of Land Commissioners on the 3d of September, 1852. It was for six leagues of land in Mariposa county, being part of eleven leagues said to have been granted to Lieut. Col. José Castro by Pio Pico, late Governor, on the 4th of April, 1846. The deed from Castro, dated 8th of June, 1849, purported to convey to Bernard McKenzie and Robert Neleigh six of the eleven leagues, "to be taken where the grantees might select." McKenzie's interest was, afterwards, vested in his co-tenant by a conveyance from his administratrix. The commissioners confirmed the claim. But as the grant to Castro had never been surveyed or located, and, like that to Fremont, was vague and uncertain as to its boundary, it might be located on either or both sides of the San Joaquin river. Their decree, therefore, did not ascertain what land was confirmed, but ordered that it be "selected by the said petitioner from the said eleven leagues *when the same shall be located by the proper authority.*" This decision of the board was affirmed by the District Court in October, 1859.

In the meantime, José Castro, in March, 1853, filed his claim for the eleven leagues, "for the benefit of himself and those claiming under him." That case came before this court at last term, and may be found reported in 24 Howard, 347. It was rejected by this court, for the reason there given, and which need not be repeated. Nor need we inquire of what use the affirmation of the decree of the District Court would be to Neleigh of a right to select six leagues out of eleven, which, by judgment of this court, never can be surveyed or located. For the purposes of the present case, also, we will assume, that as Neleigh was not a party on record in the former case, he is not concluded by the judgment given in it, and inquire whether he has furnished any new evidence, which, if it had been found in the record of the Castro case, would have led us to a different conclusion. Now, it must be kept in remembrance that the grant to Castro was not rejected, because

it was not signed by the persons whose names are affixed to it. It is a historical fact, and proved by satisfactory evidence, more than once, that, after that country passed into the possession of the United States, the late Governor was very liberal in executing grants to any person who desired them, and for any quantity of land. It was easy to prove his signatures, and Pio Pico himself, when called as a witness, could never recollect anything about *the date*, which was the only material question in the inquiry as to its validity. Of the last two secretaries who attested these grants, one has been found capable, not only of writing false grants, but of supporting them by his oath. Of the other, we have been compelled to say, that he was following in the footsteps of his predecessor.

It is well known that espedientes and records of the grants made in Pico's time were carefully put away by him in boxes, which came into the possession of Col. Fremont, and were delivered to the public officers. These espedientes are all found safe among the records, but the "*toma de razon*," or short record of them, has disappeared. Hence, when a grant is produced for the first time from the pocket of the claimant, and is attempted to be established by proof of the signatures of the Governor and Secretary, the want of an espediente or archive evidence is expected to be excused by the proof that some papers were lost and torn when they were carried away on mules by Col. Fremont, or used "*as cartridge paper*," according to Pio Pico's theory. The enormous frauds which have been attempted to be perpetrated, depending on this theory of the destruction of records, have compelled us to reject it altogether as fabulous. These archives have been collected, and are found in a very tolerable state of preservation. Hence, the propositions laid down in the Castro case, and others preceding it, were an absolute necessity to save the Government from utter spoliation of its territory.

It would be superfluous to repeat the principles laid down in the Castro case. It is sufficient to say, that the additional testimony in this case does not relieve it from its deficiencies there stated. The testimony of Colonel Fremont of having seen some paper concerning a grant to Castro, does not prove

the existence of *this* grant, which was not the only property claimed by Castro in California. The testimony of the late Governor adds nothing to the evidence. He, as usual, acknowledges the genuineness of his signature, which was not disputed; but as to the important question, whether it was made before or after his expulsion by the Americans, he is entirely silent. He could not remember historical facts connected with his administration; that at the *date* of this grant he was at bitter feud with Castro, who had seized upon the custom-house at Monterey, and set the Governor at defiance, and that the Governor was preparing troops, at this time, to compel his submission. The declaration of the witness, that he should nevertheless as soon make a grant to Castro as to any other, is no doubt true, if it refers to the true date of the transaction, after they had both been superseded and deposed by the Americans. Nor. does it add anything to the value of this testimony, that the witness explains that, by want of recollection, he means his unwillingness to state the truth.

Moreno, who is always a more willing witness, and who labors under no want of memory or imagination, is brought to supply this want of record proof, and accounts for his signature to the grant being dated when he was *not* Secretary. He swears that he signed it after its date, in the beginning of May, but whether it was May, 1846, 1847, or 1848, he does not state directly, but leaves it to inference that he meant 1846.

But if we were in any doubt as to the credibility of the testimony of this witness, there are other facts established which demonstrate, that if he had stated explicitly that he signed this grant, and recorded it in May, 1846, the assertion would have been untrue.

On the 4th of April, 1846, the date of this grant, it is a fact not only that Moreno was not Secretary, but that Pio Pico *was not Governor*. He first presented his appointment as Governor, to the Assembly, on the 15th of April, 1846, and was inaugurated on the 18th. The first grant made by him, in which he is styled Governor, is that to Pedro Sansevaine, dated the 21st of April. In all his previous grants he is styled "First Vocal and Governor ad interim." This deed was evidently written

so long after, that this fact had escaped the recollection of the parties signing it. In the beginning of May, 1846, it was becoming apparent to all concerned that the power of the Governor and the Assembly would soon pass away. Pio Pico, therefore, prudently gathered up the grants of land which had not been previously laid before the Departmental Assembly for their approval. He accordingly, on the 3d of June, 1846, sent in to them no less than forty-five espedientes. One of these was made in 1839. The others were all dated in 1845 and 1846; the last three on the 2d and 3d of May, 1846. Fortunately, we have the minutes of the Assembly, by which it appears that these forty-five espedientes were reported and confirmed on the 8th of June, 1846. This grant to Castro does not appear among them, and is left to the uncertain testimony of Moreno to establish its existence; and we are asked to presume that it alone was kept back from the Assembly, and that while all the other genuine grants confirmed by them are found among the archives in good order, this alone was converted into "cartridge paper." All these presumptions must be made on the faith of these witnesses, whose testimony we have heretofore declared could not be received to contradict or supply record evidence.

In the former case, this grant to Castro was rejected for the negative reason that there was not the evidence required to prove it genuine. The testimony in the present case has proved it positively spurious.

: *Let the decree of the District Court be reversed.*