## UNITED STATES *v.* ORTIZ.

### APPEAL FROM THE COURT OF PRIVATE LAND CLAIMS.

No. 20. Argued October 11, 1899. — Decided February 26, 1900.

In the hearing of an application for confirmation of an alleged Mexican grant the law casts primarily upon the applicant the duty of tendering such proof as to the existence, regularity and archive record of the grant, as well as his connection with it, such as possession, ownership and other related incidents, of sufficient probative force to create a just inference as to the reality and validity of the grant, before the burden of proof, if at all, can be shifted from the claimant to the United States.

The surveyor general had authority to make a supplementary investigation, and the supplementary proceedings were properly admitted in evidence.

The special qualifications of the witness Tipton, resulting from his great familiarity with the signatures of Armijo and Vigil, qualified him to testify as an expert as to the genuineness of the signatures upon the alleged grant which were claimed to be theirs.

Genuine signatures of Armijo and of Vigil, shown to have come from the archives, were properly received in evidence as standards of comparison with the signatures offered to prove the alleged grant.

Enlarged photographs of such original signatures were also properly received.

After an extended examination of the testimony, the court holds that it is unnecessary to examine or decide upon the questions made as to the form of the alleged grant and other questions, and refrains from expressing an opinion upon all, and holds that the court below erred in confirming the grant.

THE statement of the case will be found in the opinion of the court.

*Mr. William H. Pope* for appellant. *Mr. Solicitor General* and *Mr. Matthew G. Reynolds* were on his brief.

*Mr. T. B. Catron* for appellees.

MR. JUSTICE WHITE delivered the opinion of the court.

Did the court below err in confirming an alleged Mexican land grant, is the inquiry which arises on this record.

The asserted grant is designated as the "Sierra Mosca," and embraces many thousand acres of land situated in the county of Santa Fe, New Mexico. The official proceedings had in relation to the grant prior to the commencement of this suit were as follows : In 1872 a petition was filed before the surveyor general of New Mexico, asking the confirmation of the grant in the name of "the heirs and those holding under them of Juan Luis Ortiz, deceased." No other or fuller description of the persons asserting the right appeared in the proceedings. The surveyor general, after hearing, forwarded his recommendation that the grant be confirmed, to the Commissioner of the General Land Office in October, 1873, and the papers were in the same year submitted by the Secretary of the Interior to Congress. The proceedings before the surveyor general and the resulting official action, as above stated, were by virtue of the act of Congress of July 22, 1854, c. 103, 10 Stat. 308. No action having been taken by Congress, in December, 1876, certain persons alleging themselves to be part owners of a claimed Spanish grant of land, which it was averred conflicted with the one in question, petitioned the then surveyor general of New Mexico to hear additional testimony as to the reality of the grant which had been recommended for confirmation, on the ground that the testimony when heard would establish that the grant had been erroneously recommended for confirmation, because, among other reasons stated, it was a forgery. Whilst intimating a doubt as to his power to review the action of his predecessor in office, the surveyor general yet ordered the inquiry to be made, and, after some lapse of time on due notice, testimony was taken. In consequence of the notice given, the attorney for the petitioners, on the original application to confirm, appeared and cross examined the witnesses. Subsequently acting upon such evidence, the then incumbent of the surveyor general's office transmitted the proceedings to the Commissioner of the General Land Office with

the recommendation that the grant be rejected on the ground that it was affirmatively shown by the proof to be a forgery. This supplementary report and papers were also, in December, 1887, submitted by the Secretary of the Interior to Congress for its consideration.

No action having been taken by Congress upon either the original or supplementary report, the present suit was commenced, in the Court of Private Land Claims, to obtain the confirmation of the grant. The petition by which the cause was initiated was filed in the name of Luis Maria Ortiz and Tomaz Ortiz, and averred that the alleged Sierra Mosca grant had been made on June 4, 1846, by Manuel Armijo, the then governor of the Territory of New Mexico, to Juan Luis Ortiz, and that the grantee had on June 8, 1846, been placed in legal possession of the granted land by Jose Dolores Trujillo, a justice of the peace, according to the laws and customs then in force in the Republic of Mexico. It was averred that "the original papers relating to this said grant of land are now on file in the office of the surveyor general of the Territory of New Mexico, known in that office as private land claim No. 75, for the Sierra Mosca tract, and are not in the control of the plaintiffs, so that they can file them herewith." A copy, however, with a translation of the papers thus referred to, was annexed to the petition. The petitioners asserted their right under the grant as follows: "The plaintiffs are the owners in fee in and to the said land grant by inheritance from their father, Gaspar Ortiz, who acquired his title thereto, as they are informed and believe, by inheritance from his father, and their grandfather, Juan Luis Ortiz, the original grantee, and by purchase from the other heirs of the same." No enumeration of the other heirs and no more precise specification of the date and character of the alleged purchase was contained in the petition.

The petition was generally traversed, and subsequently an answer was filed, specifically averring that the alleged granting papers were forgeries, and denying that delivery of possession had ever been made by a justice of the peace, as stated in the petition. After trial upon these issues, the grant was confirmed, Murray, J., dissenting.

Inverting the order in which they have been discussed at bar and stating them in a condensed form, the questions presented for decision are : First. Does the proof establish that the grant in question was made and that delivery of juridical possession thereunder was operated by a Mexican official charged with such duty ?   Second. If it be found that the grant was made, was there legal power in the then governor of New Mexico to make it, and, if so, was the power so executed as to authorize the court to enter a decree of confirmation ?   The first of these questions opens for consideration not only the issue of forgery, but also involves deciding whether the proof is of such a character as to engender the affirmative conviction of the genuineness of the granting papers.   The second raises several questions of law — that is, as to the power of the governor, at the date when the alleged grant is averred to have been made, the necessity of approval of his action by the departmental assembly, and other legal issues.   Necessarily, all the questions coming under the second head arise only in the event the objections to the confirmation of the grant embodied in the first proposition are found to be untenable.

Before analyzing the evidence in order to develop and weigh the proof tending to show the existence of the grant, it will subserve clearness of statement, at the outset, to determine upon whom is cast the burden of showing the existence of the grant, and in a general way to consider briefly the quantum of proof required for that purpose.   By the first subdivision of section 13 of the act of March 3, 1891, c. 539, 26 Stat. 854, constituting the Court of Private Land Claims, that court and this court are commanded not to allow a claim "that shall not appear to be upon a title lawfully and regularly derived from the Government of Spain or Mexico," etc.   The statute authorizes no presumption in favor of the genuineness of a title from the mere fact that the claimant for confirmation presents a paper which is asserted to be a grant from a Mexican official.   The command of the statute is not that the United States, when an alleged Mexican title is presented for confirmation, shall be put to the burden of showing that the title in question is not genuine, but that the evidence presented in favor of the asserted

title shall be of such persuasive and preponderating force as to convince the court that the title is real, and besides, possesses the legal attributes which the statute requires as essential to confirmation. It is clear then that the law casts, primarily, upon the applicant for confirmation, the duty of tendering such proof as to the existence, regularity and archive record of the grant as well as his connection with it, such as possession, ownership and other related incidents, of sufficient probative force to create a just inference as to the reality and validity of the grant before the burden of proof, if at all, can be shifted from the claimant to the United States. This construction which arises from the text of the act of 1891 is sustained by considering that previous to that enactment there had been many decisions of this court, rendered under the California act of 1851, construing that act as imposing upon the claimants for confirmation the primary burden of proof, although the provisions of the California act were not as explicitly mandatory as are those of the act of 1891. Thus from the date of the decision in *United States* v. *Cambuston*, 20 How. 59, announced in 1857, to the ruling in *Berreyesa* v. *United States*, 154 U. S. 623, rendered in 1876, it was often decided that the burden of proof to sustain a Spanish grant rested upon the claimants, and that the failure to show that the official archives contained evidence that the grant had been made and the fact of the production of the original title papers solely from the custody and possession of the grantee were circumstances so suspicious as to create a presumption against the genuineness of the grant, calling for the production by the grantee of more than slight evidence to overthrow the presumption. *Luco* v. *United States*, 23 How. 515, 528; *Peralta* v. *United States*, 3 Wall. 434, 440. Indeed, this burden of proof resting upon the grantee had been frequently declared by this court, prior to the enactment of the law of 1891, to be essentially necessitated by the situation and as the sole means of avoiding the danger of imposing upon the United States by means of forged or fabricated grants. *United States* v. *Teschmaker*, 22 How. 392, 405; *United States* v. *Pico*, 22 How. 406; *Fuentes* v. *United States*, 22 How. 443; *Luco* v. *United States*, 23 How. 515; *United States* v. *Bolton*, 23 How.

341, 347; *Palmer* v. *United States*, 24 How. 125; *United States* v. *Knight's Administrators*, 1 Black, 227 ; *United States* v. *Neleigh*, 1 Black, 298; *United States* v. *Vallejo*, 1 Black, 541; *White* v. *United States*, 1 Wall. 660; *Romero* v. *United States*, 1 Wall. 721, 743; *Pico* v. *United States*, 2 Wall. 279, 281; *Peralta* v. *United States*, 3 Wall. 434.

It is preliminarily necessary to dispose of certain exceptions taken to the admissibility of evidence, and which are pressed on our attention.

1. The petitioners in opening their case offered in evidence the original proceedings before the surveyor general, including the testimony of the witnesses then examined, after having made the prerequisite proof of death of such witnesses in accordance with the requirements of section 5 in the act of 1891. 26 Stat. 854. Subsequently, the defendant, in proving its case, offered the supplementary proceedings which had been had before the surveyor general (including the testimony of the witnesses taken in that proceeding — proper foundation, also having been laid for the introduction of such testimony), the finding of the surveyor general made in the proceedings, and the forwarding of the whole to the Commissioner of the General Land Office, and the submissions made of all the matters in question by the Secretary of the Interior to Congress. All this was objected to on the ground that the power of the surveyor general was exhausted by the original investigation and report, and that therefore a succeeding incumbent of the office was without legal authority to have further considered the grant or to have taken any additional testimony as to its genuineness or validity.

But the function of the surveyor general, under the act of 1854, 10 Stat. 308, was merely advisory, and, until action by Congress had supervened, it was not only the right, but the duty of that official, on proper suggestion being made to him, to hear additional evidence and transmit it for the consideration of Congress, in a claim pending for confirmation. The act of the surveyor general in making the supplementary investigation was certainly either directly or impliedly authorized or ratified by his official superiors, since the knowledge of

the investigation was conveyed to the Commissioner of the General Land Office, and not only the action taken by the surveyor general, but all the papers relating thereto, were by the Secretary of the Interior laid before Congress. Obviously, the purpose of the fifth section of the act of 1891, in permitting the use, subject to the restrictions and qualifications found in the act, of the proceedings had before the surveyor general, was to allow all the proof then existing to be received and to be given such weight as it was entitled to have. The court below therefore properly admitted the supplementary proceedings.

2. William Tipton was called as a witness for the government. The witness, after stating that he was appointed by the Department of Justice to assist in preparing the defence of cases coming before the Court of Private Land Claims, proceeded to say that for a long period of time, covering about sixteen years, he had been previously employed in the office of the surveyor general of New Mexico; that in such employ as clerk, copyist, translator and custodian of the archives, he had constant official occasion to examine, translate and consider the Spanish and Mexican archives extant in the office; that, in consequence of these facts, he was entirely familiar with the signatures of Governor Armijo and Secretary Vigil, the signatures of whom purported to be affixed to the grant relied upon; that his knowledge on the subject had been derived from examining not less than seventy-five or eighty signatures of Governor Armijo, and not less than one hundred and twenty signatures of Secretary Vigil, found in the archives, which were either attached to grants, to the journals of the territorial deputation and departmental assembly, or to other official documents. Besides the familiarity of the witness with the signatures in controversy, he was examined as to his capacity as a general handwriting expert, the whole as a basis for eliciting from him his opinion as to the genuineness of the signatures referred to. Objection was made to allowing the witness to testify on this subject, because it was contended the proof did not lay an adequate foundation therefor, and the overruling of this objection was excepted to.

It is unnecessary to decide whether the witness was competent to express an opinion as a general scientific expert on handwriting or to consider the limitations as to the admissibility of testimony of that character, since the special qualifications of the witness resulting from his great familiarity, acquired during a long course of official action, with the official records and the signatures of Governor Armijo and Secretary Vigil, qualified him beyond question to testify as an expert as to the genuineness of the signatures found upon the alleged grant. The case is directly within the principle decided in *Rogers* v. *Ritter*, 12 Wall. 317, where it was held that witnesses who in the course of administration of the duties of an official position had acquired a familiarity with a certain signature, although they had never seen the party write and had never corresponded with him, were competent to express an opinion on the subject of the genuineness of a signature purporting to have been made by that person. The court said (p. 322):

"It is settled everywhere, that if a person has seen another write his name but once he can testify, and that he is equally competent, if he has personally communicated with him by letter, although he has never seen him write at all. But is the witness incompetent unless he has obtained his knowledge in one or the other of these modes? Certainly not, for in the varied affairs of life there are many modes in which one person may become acquainted with the handwriting of another, besides having seen him write or corresponded with him. There is no good reason for excluding any of these modes of getting information, and if the court on the preliminary examination of the witness can see that he has that degree of knowledge of the party's handwriting which will enable him to judge of its genuineness, he should be permitted to give to the jury his opinion on the subject."

Referring to the testimony of the witnesses showing knowledge derived from the connection with the official archives which were undoubtedly genuine, the court added:

"The three witnesses told enough to satisfy any reasonable mind that they were better able to judge of the signature of

Sanchez, than if they had only received one or two letters from him, or saw him write his name once."

The court below did not err in admitting the testimony.

3. The witness Tipton produced fifteen signatures of Governor Armijo and several of Secretary Vigil, written approximately about the time when the alleged grant in question purported to have been made, taken from among the signatures of these officers contained in the archives, and they were offered as standards of comparison with the signatures found on the grant in controversy. It is objected that the genuineness of these signatures had not been adequately proved, and therefore they should not have been admitted to be used as standards of comparison.

They were correctly received. The whole testimony of the witness demonstrated that the signatures in question were upon documents which the witness produced from the archives, the appropriate place for them, and the genuineness of the papers to which they were annexed had never been challenged and were officially treated as authentic. This justified their admission, at all events in the absence of any suggestion of proof as to their non-genuineness.

4. The defence caused the signature of Governor Armijo to the alleged grant and one existing on one of the documents offered as a standard of comparison, to be photographically enlarged. After proving by the photographer by whom the photographs were made the accuracy of the method pursued and the results obtained by him, the enlarged photographs were tendered and were admitted in evidence over objection. The ruling was correct. *Marcy* v. *Barnes*, 16 Gray, 161, 163.

The petitioners offered in evidence the alleged granting papers, which are reproduced in the margin.[1] Postponing for after consideration the determination of the legal value

---

[1] [Translation.]
Alleged Documents of Title.
" Most excellent governor and commanding general of the Department of Mexico :
I, Juan Luis Ortiz, a resident of Pojoaque, before the superiority of your

of the documents so offered, we come to review the evidence relied upon to show that the asserted grant had been actually executed. Having proven the death of all the witnesses who

---

excellency, with the highest respect and in the most ample form allowed by law and proper for me, appear and state: That, desiring through the most legitimate and proper means to encourage agriculture, so much recommended of the laws, and finding myself at this time with land so considerably restricted as not to furnish a fair subsistence for the support of the large family I provide for, and having seen and examined with great care a tract of public land which is situated near the place of my residence, which I describe to your excellency under the following boundaries: On the east by a mountain called the Mosca, or Panchuelo slope; on the west one fourth of a league below the waterfall on the Little Springs Meadow; on the north a little flat mountain and some arroyos running between north and west; and on the south a rocky hill situated above the Chupadero Valley, or boundary of the citizens of Tesuque River; and finding in the said tract, which I solicit of your excellency, the advantage of containing fertile lands for cultivation, pastures and water sufficient, and else which is needed necessary for raising stock; and, satisfied, as I am, that it is public and unappropriated land, as I have already stated, I have not hesitated to apply to the justice of your excellency, asking, very respectfully, that for the sake of, and in justice, you be pleased to grant me the said possession, which I ask in the name of the Mexican nation, to which we have the honor to belong, protesting that I do not act in dissimulation, and whatever be necessary, etc., stating to your excellency at the same time that my petition is not upon paper of the proper stamp, there being none in this city; but I promise to attach one cancelled as soon as there shall be any.

Most excellent sir,                                    JUAN LUIS ORTIZ.
Sante Fe, June 3, 1846.

SANTA FE, N. M., *June 4th,* 1846.

What is stated by the petitioner in the foregoing petition, asking that there be granted to him the public land which he describes in the same, being true, and this government being convinced of the good reasons he sets forth, the petitioner will apply to the proper justice that he may place him in possession of the land solicited in entire conformity to the laws in the premises.

JUAN B. VIGIL Y ALARID, *Sec.*                        ARMIJO.

At this place, our Lady of Guadulupe of Pojoaque, on the eighth day of the month of June, one thousand eight hundred and forty-six, before me, Citizen Jose Dolores Trujillo, justice of the peace at said place, appeared Citizen Juan Luis Ortiz, resident of the same, who presented me the foregoing superior decree of Manuel Armijo, most excellent governor and commanding general of the Department of New Mexico, placed upon the margin of the present petition, dated on the 4th instant, in which I am notified

testified before the surveyor general in 1872, offer was then made of all the proceedings, including such testimony. Upon this evidence and the testimony of one witness tending to show the possession at one time in the original grantee of the granting papers, the claimants in opening rested.

The witnesses who testified before the surveyor general in 1872 were as follows: Antonio Sena, who was for some time prior to December, 1845, prefect of the department in which the land in question was situated and who ceased to hold that office about the month stated, and after an interregnum again held the office after the end of March, 1846; Ramon Sena y Rivera, who in 1846 was an employee in the office of the military commandancy of New Mexico, under the official direction of Donaciano Vigil, military secretary of Governor Armijo in June, 1846; and prior thereto; Pablo Dominguez, who was also employed as clerk in the same office with Ramon Sena y Rivera, and Joab Houghton, Esq.; an attorney residing at Santa Fe, who had been United States vice consul, chief justice and associate justice of the Supreme Court of the Territory, and register of the United States land office. Of these witnesses, the two first (the Senas) testified

---

to place the said Juan Luis Ortiz in possession of the land he requests be granted him, in conformity with the laws of possession; wherefore, I, said justice of the peace, accompanied by my attending witnesses, proceeded to put in execution the said superior decree, which I fulfilled, designating the boundaries set forth: On the east a high mountain called the Mosca, or Pachuelo slope; on the west a fourth of a league below the waterfall on Little Springs Meadow; on the north a small flat mountain, some arroyos running between west and north; and on the south a rocky hill, which stands above the Chupadero Valley, or boundary of the residents of Tesuque River; and having complied with what I am directed to do by the most excellent governor and commanding general aforesaid, I gave him to understand that said favor and donation has been conferred upon him in the name of the Mexican nation, to which we have the honor of belonging. And in due testimony as well in the present as in the future, I executed to him the present document of possession, signed by myself and my attending witnesses, with whom I act specially for lack of a notary public, there being none in this department. To all of which I certify.

JOSE DOLORES TRUJILLO.

Attending: YGNACIO ALAVID.
Attending: MIGUEL GONZALES."

that the grant was genuine, from the fact that they had seen it executed, one besides swearing that he was present at the delivery of juridical possession by Jose Dolores Trujillo, the alleged justice of the peace. The other two witnesses (Houghton and Dominguez) testified to their familiarity with the signatures of Governor Armijo and the civil Secretary Vigil, from having seen them write and sign, and that the signatures to the alleged grant were in their opinion genuine.

The defence offered the proceedings before the surveyor general on the supplementary hearing, in 1878, including the testimony then taken of witnesses since deceased, and then offered other proof, oral and documentary, tending to make out the defence. The only evidence directly relating to the genuineness of the signatures was that of Donaciano Vigil and William Tipton, the signatures of Armijo and Vigil introduced for the purposes of comparison, and the enlarged photographs heretofore referred to. The question then is, Did the evidence offered by the petitioners make out a case, and if so, did the defence rebut the proof, if any, which arose from the evidence upon which the claimants rested?

Without reference to the testimony of the witnesses on either side, a comparison of the signatures of Governor Armijo and Secretary Vigil, as found on the alleged grant, with the signatures on the documents offered for the purposes of comparison, engenders, in our minds, a very strong conviction against the genuineness of the grant relied upon. And this conclusion is not at all shaken by a comparison of the signatures to the grant with those which were introduced by the petitioners in rebuttal, also for the purposes of comparison. Without elaborating the reasons by which the conviction of want of genuineness is suggested, by the comparison, it suffices to say that the entire characteristics of the signatures to the grant present such saliently suspicious features, when the comparison is made, as to leave it impossible for the mind to resist if not the absolute conviction, in any event the grave doubt which irresistibly arises. It is worthy of being noted that the surveyor general before whom the first proceedings were had considered that the mere inspection of the signatures to the

grant created such a doubt of its genuineness that he would not have been able to have recommended confirmation on the face of the papers, but for testimony taken before him.   He said:

"I doubted at first the genuineness of the papers as showing the grant and possession to have been given as set forth; but the testimony brought before me, especially of the two last witnesses, who, beyond all question, are highly respectable men, has set my mind at rest on that point."

By the application of the rule which we have at the outset referred to, casting upon the claimant the burden of sustaining the validity of an asserted grant, we are compelled to refuse to affirm the judgment of confirmation, unless the testimony offered for the claimants removes the doubt in question.

Now, the testimony as to the grant as we have seen was twofold in its nature.   First, Joab Houghton and Pablo Dominguez, who, from a knowledge of the handwriting of the officials, testified that in their opinion the signatures on the grant were genuine, and that of the two Senas who swore that they had personally witnessed the execution of the grant, and therefore gave direct testimony to the genuineness of the signatures.   Let us consider whether these two classes of evidence dispel, if not the conviction, at least the grave doubt which has arisen, as above stated.

The testimony of Mr. Houghton, whose sincerity we do not doubt, embodied but his opinion of the genuineness of the signature.   That the appearance, however, of the signatures was, to his mind — as it was to that of the surveyor general — suggestive of suspicion, is, we think, manifest from his testimony. Thus, on being shown the alleged decree or grant, and on being asked by counsel for claimants whether the signatures of Armijo and Vigil were genuine or not, the witness said: "I recognize Armijo's signature as being genuine on this document, as I do that of Juan B. Vigil, though signed somewhat differently from his usual way."   Being interrogated by the surveyor general, and after stating that he did not know that Mexican officials used steel pens at Santa Fe in 1846, the witness testified as follows:

" Q. Was Governor Armijo in the habit of becoming intoxicated ?

" A. I think not. I have seen him often, but never saw him intoxicated.

" Q. Have you ever seen him in a condition of excitement or nervousness, such as would be likely to affect his handwriting if using a kind of pen he was unfamiliar with ?

" A. Yes; I have seen him frequently in such a condition, particularly at the time of the battles in Mexico in 1846, and of the approach here of the American troops during the summer of 1846."

The testimony of Dominguez also but expressed his opinion. The probative force of the opinion of this witness as to the signatures in question is greatly weakened, however, by his statements on other subjects, such as the possession under the grant and the official capacity of Trujillo as justice of the peace, which, as will be hereafter seen, are entirely irreconcilable with the facts, which if not conclusively established, are in any event sustained by a preponderance of proof.

In conflict with the opinion of Houghton and Dominguez is that expressed by Donaciano Vigil in his testimony on behalf of the Government. He, as has been stated, was military secretary of Governor Armijo at the time the grant was alleged to have been made, and Dominguez was a clerk in Vigil's office. With respect to the signatures upon the decree, purporting to have been made by Armijo, the witness said that he had been intimate with Governor Armijo, and had seen him write, and was well acquainted with his handwriting, and, while unwilling to swear positively that the signature " Armijo" on the decree was not genuine, because the witness had not actually seen the name written, the witness swore that Governor Armijo always wrote his name like the signature upon a document exhibited by the witness, which he had seen Armijo write, and further stated that he (the witness) had never seen a genuine signature of Governor Armijo like that on the decree of grant, and that, in his judgment, " the signatures is not the same Armijo was accustomed to write."

The testimony of this witness conveys an impression of con-

scientious circumspection, the absence of which is particularly to be remarked in the testimony of Dominguez with which Vigil conflicts. The document produced by Vigil as a type of the signature of Armijo has been certified up, and placing it in juxtaposition with the signature of Armijo on the alleged grant fortifies and strengthens the doubt arising from the comparison previously referred to.

The testimony of Vigil is fortified by that of Tipton, who, in lucid and cogent reasoning, supports the opinion which he unequivocally expressed, that the signatures of both Armijo and Vigil y Alarid were not genuine. The proof on this branch of the case, in the best view which may be taken of it for the petitioners, comes then to this: The genuineness of the signatures to the grant as a matter of opinion is supported by two witnesses, the testimony of one of whom at once suggests the doubt which arises on the face of the paper and the statements of the other one of whom is weakened by his declarations on other subjects which, as will be hereafter seen, have been substantially overthrown. On the other hand, the proof of want of genuineness as a matter of opinion is sustained by two witnesses, one of whom (Vigil) based his opinion from an intimate official and personal relation with Governor Armijo which existed at the time the alleged grant was made and prior thereto, and the other of whom, Tipton, by a long official relation with documents containing the signatures of Governor Armijo and Secretary Vigil, had apt and valuable means of forming a correct and reliable opinion, and whose testimony is so clear and so intelligent as to carry great weight with it. This state of the proof certainly, instead of removing the doubt suggested by the inspection and comparison, greatly confirms it.

What, then, is the effect of the testimony of the two witnesses (the Senas) who in the first proceeding before the surveyor general testified to their personal knowledge of the signing of the grant?

Antonio Sena, after stating that he was prefect in June, 1846, of the first district of New Mexico, on being asked whether a grant had been made, and, if he replied yes, to say by whom and to whom, testified as follows:

Opinion of the Court.

" There was a grant made for this property in June, 1846, by Governor Armijo to Juan Luis Ortiz; and the decree now here is the original one, signed by Governor Armijo, in my presence, on the 4th day of June, 1846. I now mean the paper in this case marked 'Sierra Mosca grant — original.' In the month of June, 1846, there was no stamped government paper here, and we had to use common paper."

Ramon Sena testified to an intimate acquaintance with the governor and secretary, and on being asked to state whether the signatures to the decree were genuine and whether Juan Luis Ortiz was placed in possession, answered:

"I have examined the signatures of Armijo and Vigil y Alarid, upon the document mentioned, and am satisfied that they are both genuine. In the year 1846 — I think in the month of June — I was requested by Juan Luis Ortiz to go with him to present to Governor Armijo a petition for land, and the petition of said Ortiz shown me on said document A is the petition, and bears the genuine signature of said Ortiz. Governor Armijo directed a clerk (I don't remember who) to write the decree, the same on the margin of the document shown me as document A, which decree he then and there signed, as did also Senor Vigil y Alarid; the governor then handed the document to Ortiz, who requested me to proceed with him to the alcalde at Pojoaque, to be by him placed in possession of the land, and who did place Ortiz in possession, executing the act in my presence, and the record of that act borne by said document A is the act of possession I refer to, and the signature of Jose Dolores Trujillo, which it bears, is his genuine signature. . . . The petition of Ortiz to the governor was presented to him in duplicate, and when he had acted upon them he handed one of the documents to Ortiz and the other he handed to Senor Vigil y Alarid, to be placed among the archives."

It is worthy of remark that it was not shown when, if dead, the attesting witnesses to the act of possession had died, and they were not called upon to testify before the surveyor general or at the trial below — a circumstance which necessarily greatly detracts from the weight of the testimony of Ramon Sena.

Both the Senas were sons in law of the alleged grantee, Juan Luis Ortiz. One was certainly a clerk with Dominguez in the office of Donaciano Vigil at the very time the grant is asserted to have been executed, and yet Vigil, who was military secretary of Armijo, says that he never heard at the time anything concerning the alleged execution of the grant. It is suggestive of doubt, therefore, that a grant for many thousand acres of land should have been made by Armijo to Juan Luis Ortiz, an acquaintance of Vigil, and yet that the fact should have been witnessed and known by a clerk in Vigil's office without any information having been conveyed to the head of that office. It is worthy also of remark that Ramon Sena says that when the grant was executed he took such an interest in it that he left the office where he was employed and went to the place where the land was situated to witness the delivery of juridical possession made by the justice of the peace, although, as already stated, Ramon Sena's name does not appear upon the act of possession as an attesting witness thereto.

In addition to the peculiarities in the testimony of the witnesses, to which attention has been called, there is a conflict between their statements which the record leaves wholly unexplained. Thus, Antonio Sena explicitly says that but one paper was signed by Governor Armijo, and that the decree shown him was the *original* grant, and he makes no reference to any duplicate original petition being presented to the governor, whilst Ramon Sena affirms that duplicate originals of the certificate were made and presented to the governor and that he acted upon both.

Despite the inconsistencies in and the improbabilities suggested by the testimony of the Senas above stated, let it be conceded, *arguendo*, that their statements of personal knowledge of the execution of the grant, standing alone, would be sufficient to overthrow the doubt engendered by the appearance of the signatures to the grant and by the other testimony on the subject, still such admission cannot be here controlling because of the fact that the testimony of the Senas is shown to have been incorrect in other particulars

so important as to deprive it of the weight which otherwise might be attributed to it.

A direct issue was made in the pleadings in this case as to the official existence of the person by whom the act of juridical possession purported to have been executed. The petition presented for confirmation to the surveyor general in 1872 alleged on this subject as follows:

"The said Juan Luis Ortiz was placed in the legal possession of said grant by Jose Dolores Trujillo, a justice of the peace, according to the laws and customs then in force in said republic, governing the making, granting and placing persons or grantees in possession of lands granted to them."

In the asserted granting papers Trujillo specifically describes himself as "justice of the peace at said place," (Pojoaque,) and grants the juridical possession in his capacity as such officer. On the subject of this official, Antonio Sena, on being shown the act of juridical possession, testified as follows:

"Q. Who was, if you can state, the justice of the peace at Pojoaque at that time?

"A. It was Jose Dolores Trujillo.

"Q. Do you know the signature of Jose Dolores Trujillo? If so, please examine the signature on the document marked 'Sierra Mosca grant — original,' purporting to be his, and state whether it is genuine.

"A. I know the signature, and have examined the one referred to; and it is his genuine signature. I, as prefect, had authority to appoint the justices of the peace in my district, and I appointed him for the precinct or demarcation of Pojoaque."

By necessary implication in the passage already quoted from the testimony of Ramon Sena, he also affirms the official character of Trujillo as an alcalde or justice of the peace.

By the Mexican law in force at the time of the making of the alleged grant a justice of the peace exercised his authority over a designated area known as a demarcation. Contemplating the contingency of the absence or inability from other cause of such an appointed official to act, there was an official known

as a *juez de paz suplente* or substitute justice of the peace.
The area embraced within the demarcation over which the
jurisdiction of the justice of the peace extended was sub-
divided into precincts, for which an inferior official was
appointed, known as a *juez de barrio*.

It is unnecessary to consider the difference, if any, between
the authority of these officials, as the question is not what was
the power of Trujillo, as an officer, but whether the proof shows
that he was an official, or at all events whether it does not give
rise to such serious doubt, on the subject, as to cause us to be
unable to sustain the alleged delivery of juridical possession.

It is clearly proven that in 1846, at the time the alleged
granting papers purport to have been executed and long prior
thereto, there was no justice of the peace for the demarcation
of Pojoaque, as there was no such demarcation. At that time
Pojoaque was a small town within the demarcation of San
Ildefonso, that demarcation being subdivided into four *barrios*,
as follows: El Rancho, Cuyamungue, Jacona and Pojoaque.

Now, the proof is that in 1845, and also in the year when
the grant was alleged to have been made (1846), the justice
of the peace of the demarcation of San Ildefonso was Jesus
Maria Serrano. This fact is established by official documents
in the record and is conceded by the defendants in error. It
is also shown by official documents, and is not denied, that in
1845 the substitute of Serrano for the demarcation of San
Ildefonso was Teodoro Gonzales. Whilst there is no official
record of the reappointment of Gonzales as *juez de paz
suplente* for the demarcation for the year 1846, Gonzales —
who was examined before the surveyor general in 1878 —
testified positively to that fact, and said that in 1846 he and
he alone was such officer. Another witness also, Jesus Maria
Ortiz y Baca, who was examined before the surveyor general
at the same time, but who again testified at the trial, con-
firmed this statement of Gonzales. The uncontradicted state-
ments of these witnesses were corroborated by those of other
witnesses living in the vicinage of Pojoaque, who said that
they knew Serrano to have been justice of the peace, and
Gonzales to have been his substitute in June, 1846, and that

although they were personally acquainted with Jose Dolores Trujillo, they never heard of his laying any claim to any one of these offices or exercising or pretending to exercise any of the functions thereof.

It is impossible to deduce any reasonable conclusion favorable to the contention that Trujillo was a *juez de paz suplente* in 1846 upon the assumption that lapse of time had led these witnesses to confound one year with another, since the testimony shows that both in 1845 and subsequently in 1846 no person of the name of Trujillo held that office.

What is the state of the proof as to the *juez de barrio* of Pojoaque in 1846, when the alleged grant was made?

Those officials, it would seem, were recommended for appointment by the justice of the peace of the demarcation, through the prefect of the district, to the governor of the department for confirmation, their commissions going to them through the justice of the demarcation. It is shown by official evidence — which is undenied — that in 1845 the *jueces de barrios* for the four precincts within the demarcation of San Ildefonso were as follows:

At El Rancho, Don Joaquin Lujan.
" Jacona, Don Jesus Lujan.
" Cuyamungue, Don Jesus Maria Ortiz.
" Pojoaque, Don Miguel Trujillo.

In December, 1845, it is shown that the then prefect of the department, Santiago Flores, addressed a letter to Serrano, as justice of the peace of the demarcation of San Ildefonso, advising him that it had been seen fit to " reëlect " him " justice of the peace for the coming year," and directing him : " As soon as you receive this to appoint the precinct justices which there ought to be within the limits of the demarcation under your charge, reporting to this prefecture with the greatest possible promptness as to whom you have appointed to those positions, in order that they be approved by his excellency the governor."

No documentary proof was adduced showing that Serrano complied with this order, although of course the assumption would be either that the incumbents held over, or that a

vacancy was not allowed to exist, and the appointments were promptly made as directed. Now, as Trujillo was not even a *juez de barrio* in the previous year, he could not have held over, and the testimony excludes the implication that he could at that time have been appointed to fill a vacancy and acted as such officer without the knowledge of the residents at the place where his functions would have been exercised.

Santiago Flores was not the incumbent of the office of prefect on January 12, 1846, as on that date one Jose Francisco Baca y Terrus was acting as prefect, and he appears from the record to have continued to be prefect as late as March 27 following, his successor in the office being Antonio Sena. Assuming then that Sena's testimony can be construed as relating to the office of *juez de barrio*, it would have to be further assumed that the appointments for the year 1846 had not been made as commanded by the prefect and as required by law, and that therefore either the offices had been vacant from the close of 1845 until Sena's assumption of the prefecture in April, 1846, or that a vacancy had occurred in the office of *juez de barrio* at Pojoaque, as to which, however, no proof has been offered. True it is that counsel for the petitioners who conducted the cross-examination of the witnesses before the surveyor general in the proceedings initiated in 1872, testified that when the files of the former demarcation of San Ildefonso were produced before the surveyor general in 1878, in looking over them he saw a paper, not among the records as produced at this trial, signed by Antonio Sena from the prefect's office, " in which he designated or appointed Jose Dolorez Trujillo as *alcalde suplente*, located at Pojoaque, in the jurisdiction of San Ildefonso," the witness afterwards correcting his testimony by stating that the document which he recollected to have seen " was dated either the very last days of the month of December, 1845, or in the first three or four months of the year 1846, and it was a document appointing Jose Dolorez Trujillo as alcalde or *juez de barrio suplente* of the jurisdiction of San Ildefonso at Pojoaque." In the brief, however, our attention is called to the fact that there is a mistake in the record, and that the word "*suplente*" in the quo-

tation just referred to is erroneously placed after the words "*juez de barrio*" instead of following the word "alcalde," and that the statement should read "*alcalde suplente* or *juez de barrio*." Although one of the questions pending before the surveyor general in 1876 was whether Trujillo had ever been appointed by Sena as a justice of the peace, it is conceded this paper was not when seen offered in evidence, nor was the attention of the surveyor general called to it, nor was any copy taken of it. The course pursued, it is said, having been taken because it was deemed that the investigation before the surveyor general could have no legal force, and because it was feared that if attention was directed to the document it might be abstracted. On this subject also there is testimony from the counsel who appeared for the petitioners in the supplementary proceedings referred to, showing that when the records were then produced he also made a critical examination of them, and no such paper as the one described was seen by him. But no conflict need necessarily arise from the statements of the two witnesses, for it might well be that a paper was seen by one of the witnesses at one time and was not seen by the other at another time, because it may have been surreptitiously placed on the files and thereafter abstracted unknown to either counsel. This is fortified by the fact that the custodian of the archives who produced them at the supplementary hearing, and who had the custody of them long prior to that occasion and was familiar with them, had never heard of or seen any such paper. If surmises were compelled, in view of the high position of counsel, the direction which conjecture would take may be indicated by the suggestion that Sena was alive at the time of the supplementary hearing, and that Gaspar Ortiz not only was alive, but on one occasion was present in an adjoining room when the testimony of witnesses was being taken before the surveyor general, although not called as a witness. Considering the paper as testified to, its presence would accentuate rather than assuage the grave suspicion which the other facts to which we have alluded give rise.

Certainly, it could not have been a cotemporaneous paper, if Sena purported to have acted as prefect in December, 1845,

and as such to have appointed Trujillo as *alcalde suplente* for the year 1846, because the official documents in the record show that on December 6, 1845, Santiago Flores and not Sena was prefect, and that Flores was such officer prior to that date appears in his official communication to justice of the peace Serrano, of date December 6, 1845, showing that before that date as prefect Flores had nominated Serrano to the governor to serve as justice of the peace for the year 1846. Nor could it have been genuine if the appointment was of Trujillo as *alcalde suplente* or *juez de barrio* during any time from the beginning of December, 1845, up to the close of the month of March, 1846, because during all that time the record shows that Sena was not prefect. Besides, if the paper as testified to was now here just as it is described in the testimony, it would not help the situation, for it would vary from the declarations in the act of possession and from the testimony of Sena. In the paper as to the delivery of possession, Trujillo represents himself not as *juez de barrio*, but as a justice of the peace, and Sena testified as follows: "I, as prefect, had authority to appoint the justices of the peace in my district, and I appointed him for the precinct or demarcation of Pojoaque." Now, as a former prefect, he was familiar with the designation of minor officials, and would not therefore have confounded ā justice of the peace with a *juez de barrio*. The official correspondence of Sena contained in the record shows that the designation "justice of the peace" was applied by Sena to the justice of a demarcation, and the term *juez de barrio* he applied to a justice of a precinct within the demarcation. And a like practice is shown by the record to have been pursued by the successor of Sena.

And on this subject the record contains a very suggestive fact.

It is shown that at a time subsequent to the date of the alleged grant the demarcation of San Ildefonso was divided, and from the territory of which it was composed there were established two demarcations, one that of San Ildefonso and the other that of Pojoaque, and that the records of the former demarcation were kept at Pojoaque. This of course necessarily gave rise to two justices of the peace, one of the demarcation

of San Ildefonso and the other of Pojoaque. The new demar-
cations thus created, if they did not continue up to the trial
below, certainly so continued for many years. The description
of the capacity of Trujillo found in the alleged act of possession
and of his official character given by Sena, is more aptly appro-
priate to the demarcation of Pojoaque as it existed after the
the division and subsequent to the making of the alleged grant.
From this circumstance may well arise the reflection that if the
papers were not executed until at or about the time their exist-
ence was publicly asserted in 1872, the mind of the draughts-
man might inadvertently have taken into consideration the
demarcation of Pojoaque created after June, 1846, and which
had many years obtained, and have thus overlooked the state
of things existing in 1846.

2. The impossibility of deducing from the testimony of the
two Senas proof sufficient to overcome the grave doubt as to
the genuineness of the grant already engendered by the proof
referred to, is further confirmed by considering the state of
the evidence on the subject of possession.

In the petition for grant Ortiz is represented as living at
Pojoaque, and as asserting that he found himself at that time
" with land so considerably restricted as not to furnish a fair
subsistence for the support of the large family " he provided
for, and it was further represented that the tract which was
solicited possessed " the advantage of containing fertile lands
for cultivation, pasture and water sufficient, and else which is
needed for raising stock." In the proceedings instituted be-
fore the surveyor general in 1872 the land embraced within
the boundaries mentioned in the grant was marked on a sketch
filed with the petition as aggregating about 115,200 acres,
while a survey made by the United States in 1876 — asserted
by petitioners in their petition filed below to be incorrect —
gave the area as 33,250.39 acres. The brief for defendants in
error, however, now declares that the claim is limited to not
exceeding eleven leagues, the claim as confirmed by the court
below. In the petition of 1872 it was averred that from the
date Ortiz was placed in possession he " and his heirs had culti-
vated a portion of said grant and the rest they have used in

herding their animals and in obtaining wood." The only proof, however, introduced by the petitioners before the surveyor general in 1872, bearing upon the occupancy or cultivation of the tract in question by Ortiz and those claiming under him, were statements contained in the depositions of Antonio Sena, Ramon Sena and Pablo Dominguez. These witnesses, however, spoke only in general terms. Antonio Sena and Dominguez simply testified that Juan Luis Ortiz and his heirs had always occupied the land and it had always been reputed to be theirs, while Ramon Sena thus expressed himself:

" Ortiz lived upon the land during his lifetime, and his heirs have continued to occupy it since his death, and it has been continuously occupied by him and them, and they have always been the reputed owners of the land, and respected as such."

The evidence introduced at the trial below, however, tended to show that the upper portion of the tract in question had been claimed by the heirs of the father of Juan Luis Ortiz under an alleged prior grant to their ancestor, and that portions of such tract had been occupied and cultivated by some of said heirs, under such claim; and a number of witnesses, relatives and neighbors of Juan Luis Ortiz during his lifetime, testified not merely that they had never known Juan Luis Ortiz to have occupied or cultivated the land, but that the existence even of the alleged grant of 1846 was not known or heard of in the neighborhood until its presentation in 1872 to the surveyor general for confirmation. Further, it is established, though Juan Luis Ortiz may have lived at Pojoaque in June, 1846, he took up his residence at Santa Fe in the house of his son Gaspar not very long after the date named. In fact, the widow of Gaspar in her testimony said that Juan Luis Ortiz died about 1861 or 1862, and that he resided at her house in Santa Fe for about twenty to thirty years before his death. If, however, we accept the statement of another witness, a relative named Jose Ortiz, aged 58 years at the time he testified, Juan Luis Ortiz died in 1859 or 1860, and lived with his son Gaspar, and clerked in the store of that son in Santa Fe for ten or twelve years before he (Juan Luis Ortiz) died. It would thus appear that Juan Luis Ortiz left Pojoaque and the vicinity of this grant for

Santa Fe, if not before, at least very soon after, the date of the asserted grant. The widow of the son Gaspar, however, did not give any evidence tending to show any knowledge on her part of any cultivation or use of the tract by or on behalf of Juan Luïs Ortiz, during her acquaintance with him, which must have extended back at least to the time of her marriage to the son, which she stated to have been in 1848. Particularly she did not explain how he could have so occupied and cultivated when living at her house in Santa Fe and acting as clerk for her husband.

Despite the great weight of the adverse testimony above referred to, the claimants in the court below introduced no evidence whatever as to possession, cultivation or improvement of the alleged granted land, except that in the opening of their case there was introduced the *ex parte* testimony of the witnesses before the surveyor general on the first investigation.

3. The foregoing considerations, weighing against the validity of the asserted grant, are fortified by the fact that although Juan Luis Ortiz and his son Gaspar lived, prior to 1854 and subsequent thereto, in Santa Fe, where was located the office of the surveyor general of New Mexico, and the act authorizing the presentation of claims to that official was passed in 1854, it was not until 1872 that the alleged grant made its public appearance. There are also many other facts and circumstances in the record casting the gravest doubt on the genuineness of the alleged grant, and tending to contradict the testimony of the Senas. To avoid too much prolixity, however, we shall not refer to them.

All the foregoing considerations render it unnecessary to examine the questions which are pressed in argument as to the form of the alleged grant here relied on, the claimed inattention to the requirements of the regulations of 1828, and: the non-production of an *expediente* or of a *testimonio* of title, upon which questions we refrain from expressing any opinion whatever. *Luco v. United States,* 23 How. 528; *United States v. Castro,* 24 How. 346; *United States v. Moorehead,* 1 Black, 227; *United States v. Knight,* Id. 228; *Peralta v. United States,* 3 Wall. 434; *Van Reynegan v.*

*Bolton*, 95 U. S. 33, 35.   The view we have taken of the proof also conclusively negates the premise of fact upon which it is argued that there was archive evidence of the grant, (as this premise must rest upon the testimony of Ramon Sena alone,) and therefore brings the case directly under the rule laid down in *United States* v. *Cambuston*, 20 How. 59; *United States* v. *Castro*, 24 How. 346; *United States* v. *Moorehead*, 1 Black, 227, and *Peralta* v. *United States*, 3 Wall. 434.

It results that it becomes unnecessary to examine the legal questions to which at the outset attention was called, and that

*The court below erred in confirming the grant, and its decree so doing is reversed and the cause remanded to that court with directions to enter a decree rejecting the claim and dismissing the petition; and it is so ordered.*