KENEDY PASTURE CO. et al. v. STATE et al. (No. 5626.)

(Court of Civil Appeals of Texas. Jan. 24, 1917. On Motion for Rehearing, June 20, 1917.)

1. BOUNDARIES ⊂⇒7—LOST CORNERS—INTERSECTING LINES.

Where the southeast corner of a survey is a known corner, and there is nothing to identify its southwest corner, if a line did run south from the true northwest corner to intersect a line run west from its southeast corner, the point of intersection will be the southwest corner.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 58–65.]

2. EVIDENCE ⊂⇒318(7)—HEARSAY.

In trespass to try title, the affidavit of a deceased county surveyor, being a sworn report to the commissioner of the land office as to what he did and found in making a survey, was not inadmissible as hearsay.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 1199.]

3. APPEAL AND ERROR ⊂⇒1050(1)—REVIEW—HARMLESS ERROR.

In trespass to try title, the admission of an affidavit of a deceased surveyor as to what he did and found in making the survey, if error, was harmless, the court's findings not having been influenced thereby.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1068, 1069, 4153, 4157.]

4. PUBLIC LANDS ⊂⇒221—MEXICAN GRANT—BOUNDARIES — SURVEY — INNOCENT PURCHASER.

Where the owner of a Mexican grant, the location of the lines and corners of which is uncertain, has it resurveyed under an act confirming the grant, and has the field notes of the surveyor returned to the land office, and has accepted a patent in accordance therewith, he is estopped, as against an innocent purchaser of lands outside those described in his patent, to claim the same, though they be in fact within the bounds of his original grant.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 685–697.]

5. PUBLIC LANDS ⊂⇒221—MEXICAN GRANT—SURVEY.

Where the owner of a Mexican grant has the lands resurveyed by the county surveyor, such surveyor acts as the agent of the owner and not of the state.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 685–697.]

6. PUBLIC LANDS ⊂⇒223(1)—MEXICAN GRANT—VALIDITY.

A void Mexican grant of public lands can convey neither legal nor equitable title.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 705–708.]

7. PUBLIC LANDS ⊂⇒175(5)—APPROPRIATION—SURVEYS.

A legal survey of public domain is an appropriation thereof.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 556, 561, 565, 566.]

8. PUBLIC LANDS ⊂⇒175(1)—LANDS OPEN TO ENTRY—PRIOR APPROPRIATION—EVIDENCE.

Const. 1876, art. 14, § 2, providing that land certificates shall not be located "upon any land titled or equitably owned under color of title from the sovereignty of the state, evidence of the appropriation of which was on the county records or in the general land office," contemplates the existence of legal evidence of such appropriation.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 555.]

9. PUBLIC LANDS ⊂⇒176(2)—PRIOR APPROPRIATIONS—NOTICE.

The record of a void grant is illegal and is not notice of its contents.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 572–575.]

10. PUBLIC LANDS ⊂⇒178(1)—PRIOR APPROPRIATIONS—EVIDENCE.

In trespass to try title, facts in the possession of purchasers of land included within the grant under which plaintiff claimed *held* not sufficient to charge such purchasers with notice of the prior appropriation.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 579.]

11. PUBLIC LANDS ⊂⇒178(1)—PRIOR APPROPRIATION—NOTICE.

In trespass to try title, reference in a deed to a grant which, if valid, would have conveyed a legal title, was not sufficient to put grantees of land included within the survey upon notice of an equitable title asserted on behalf of the original owner.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 579.]

12. VENDOR AND PURCHASER ⊂⇒242—BURDEN OF PROOF—INNOCENT PURCHASERS.

The burden is on him who asserts a prior equitable title as against the legal title to prove

⊂⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

that the holder of the legal title did not pay value.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. §§ 603–605.]

13. VENDOR AND PURCHASER ⬤⟲236—PURCHASERS FOR VALUE—"VALUABLE CONSIDERATION."

In trespass to try title, where the parties relied upon their purchase from the state, the fact that they paid only one-fortieth of the purchase price does not make them merely pro tanto purchasers for value, since a valuable consideration may be other than the actual payment of money.

[Ed. Note.—For other cases, see Vendor and Purchaser, Cent. Dig. § 570.

For other definitions, see Words and Phrases, First and Second Series, Valuable Consideration.]

14. PLEADING ⬤⟲245(3)—AMENDMENT—TIME FOR.

Under Rev. St. art. 1824, providing that all amendments to pleadings shall be filed before the parties announce ready for trial and not thereafter, it was not error, in trespass to try title, to allow defendants, who have specially pleaded a legal title, to amend so as to allege an equitable title, after the trial had proceeded for 10 days, such amendment being within the discretion of the court.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 658, 659.]

15. EVIDENCE ⬤⟲349—COPIES OF RECORDS—LETTERS.

Letters from Mexican officials to other officials in Mexico, certified by their official custodian, are not admissible as certified copies, under Rev. St. art. 3694, providing that copies of the record of all public officers and courts of this state, certified to under hand and seal, if there be one, of the lawful possessor of such record, shall be admitted as evidence, and article 3700, providing that recorded instruments may be admitted in evidence without proof in certain cases.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1384–1387.]

16. EVIDENCE ⬤⟲366(5)—COPIES OF LETTERS—PRELIMINARY PROOF.

Letters from Mexican officials to other officials in Mexico are not admissible as examined copies without extrinsic evidence that they were written by officials to officials in their official capacities and in the line of their official duties, including the genuineness of the signatures.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 1526.]

17. EVIDENCE ⬤⟲378(1)—LETTERS—AUTHENTICATION.

In trespass to try title, evidence held to show the genuineness of letters written by Mexican officials to other officials to justify their admission.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1648, 1655.]

18. APPEAL AND ERROR ⬤⟲1050(1)—REVIEW—HARMLESS ERROR.

In trespass to try title, the admission of letters from a deceased surveyor, notifying certain parties that he would make surveys in the neighborhood, if error, held harmless.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1068, 1069, 4153, 4157.]

19. EVIDENCE ⬤⟲318(2)—HEARSAY.

In trespass to try title, letters written by Mexican officials to other officials, relative to the original grant of land in question, were not inadmissible as hearsay, where the writers were dead and there was circumstantial guaranty of genuineness.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 1194.]

On Motion for Rehearing.

20. PUBLIC LANDS ⬤⟲175(7)—LOCATION—NOTICE OF ORIGINAL GRANT.

In trespass to try title, evidence held not to sustain a finding that, when defendant's predecessor located his survey, he had notice that a certain person had seen what appeared to be an original grant of land to another.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 561, 570.]

21. BOUNDARIES ⬤⟲3(3) — CALLS — COURSES AND DISTANCES.

A call for a well-known natural object controls a call for a point on a line fixed by the surveyor.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 6–19.]

22. TRESPASS TO TRY TITLE ⬤⟲34—PLEADING—DISCLAIMER.

Under Rev. St. art. 7752, providing that, where defendant claims a part of the premises only, the answer shall be equivalent to a disclaimer of the balance, where a defendant in trespass to try title pleads not guilty, and also specially pleads his title to all lands in controversy, the plea of not guilty will be disregarded.

Appeal from District Court, Travis County; Charles A. Wilcox, Judge.

Trespass to try title by the state of Texas and others against the Kenedy Pasture Company and others. Judgment for plaintiffs, and defendants appeal. Affirmed, and rehearing denied in part and in part granted.

Jas. B. Wells, of Brownsville, and White, Cartledge & Graves, of Austin, for appellant Kenedy Pasture Co. Jas. B. Wells, of Brownsville, G. R. Scott, Boone & Pope, of Corpus Christi, and White, Cartledge & Graves, of Austin, for appellants J. G. Kenedy and others. Ball & Seeligson and C. W. Trueheart, all of San Antonio, for appellees Tarut and others. John L. Terrell, of Dallas, and Lyndsay D. Hawkins, of Austin, for appellees Tindall and others. B. F. Looney, Atty. Gen., and G. B. Smedley, Asst. Atty. Gen., for the State.

JENKINS, J. This suit was brought by the state of Texas against the Kenedy Pasture Company, a corporation, John G. Kenedy, and 126 other defendants, whose number was increased by consolidation with other suits, and by pleas of intervention, most of whom were Mexicans, claiming as the heirs of Pedro Villareal, and assignees of such heirs. Said Mexican defendants and those claiming under them, except the Kenedy Pasture Company, will hereinafter be referred to as the "Mexican Defendants." The defendants G. T. Tindall and wife, A. C. Tindall, Mrs. E. M. Jeffers, a widow, George M. Crocker, Frank E. Crocker, Arthur Verne Crocker, and Ann Boyd, who purchased from

the state 19 sections of school land involved herein, will hereinafter be referred to as "Purchasers from the State." The defendants Byrdie T. Tarut, Chas. Tarut, R. L. Ball, Aggie F. Ramsey, L. O. Ramsey, B. F. Deatherage, Ophie F. Collins, Ermengard Collins, Robert S. Collins, and D. W. Light will hereinafter be referred to as the "Fant Heirs."

The land described in the state's petition may be briefly described as bounded on the north by Olmos creek; on the east by El Paistle and Las Barrosas grants; on the south by Las Barrosas and the San Antonio del Encinal grants; and on the west, by the Santa Rosa de Arriba grant.

The following sketch will aid in understanding both the issues involved and the findings of facts:

state, and the Fant heirs, alternate railroad certificates have been located, and are claimed by defendants herein as the owners of such certificates and the land located by virtue of the same, and as purchasers from the state of the school sections. The defendants the Kenedy Pasture Company, John G. Kenedy, and the Mexican defendants claim that the Santa Rosa de Abajo (the lower Santa Rosa, which will hereafter be referred to as the Abajo) is a valid Mexican grant, to the extent, at least, of conferring an equitable title upon the grantee, Pedro Villareal, and those claiming under him, and that said survey is located about 1,900 varas further west than as claimed by the state, the purchasers from the state, and the Fant heirs.

The issues raised by the pleadings are the validity of the Abajo grant, the boundaries

According to the contention of appellants, these surveys should be located about a mile further west.

The alternate sections cover the Abajo.

The Crocker sections 1 to 11 lie west of the Abajo as here located.

Upon the land marked on the above sketch "Santa Rosa de Abajo," as its location is claimed by the state, the purchasers from the

of said grant, estoppel, innocent purchase, and limitation.

### Findings of Fact.

(1) La Parra, a 15-league survey, was surveyed by Fuentes, August, 15, 1832.

(2) El Paistle, Santa Rosa de Abajo, Santa Rosa de Arriba (hereinafter referred to as Arriba), and Las Barrosas were surveyed by

the same surveyor, viz. Canales, at about the same time, to wit, in December, 1832.

(3) As originally surveyed, El Paistle adjoins La Parra, Abajo adjoins El Paistle, and Arriba adjoins Abajo.

(4) The original field notes of La Parra, Abajo, and Arriba appear in the record; the original field notes of El Paistle do not.

(5) La Parra, El Paistle, and Arriba were confirmed by the state by the act of February 10, 1852; Abajo has never been confirmed.

(6) On April 12, 1848, the governor of Tamaulipas issued a grant to Pedro Villareal for the Abajo survey. This grant, having attached thereto, as a part thereof the field notes of said survey, purporting to have been legally made for Pedro Villareal in December, 1832, and reciting that said Villareal paid into the treasury of said state on January 18, 1833, the appraised value of said land ($165), was filed by Col. W. A. Craft, as agent for the heirs of Pedro Villareal, with the county clerk of Cameron county, where the land was situated, August 8, 1879, and by said clerk recorded in the deed records of said county on same day.

(7) Said grant was filed by said Craft with the county surveyor of Cameron county, August 18, 1879, with request that said surveyor survey said Abajo grant, and return the field notes to the general land office.

(8) On November 28, 1879, J. J. Cocke, county surveyor of Cameron county, surveyed the Abajo grant, as requested by Col. Craft, recorded his field notes in his office, and returned the same to the land office, and the same were there filed December 31, 1879, and indorsed, "Covered by S. 2029 and 2030 and S. 2376 to 2392; otherwise correct map of Cameron, Hidalgo, and Nueces Co.'s, June 11/86."

(9) The said field notes of Abajo, as made by J. J. Cocke for the heirs of Villareal, located the Abajo as claimed herein by the state, the purchasers from the state, and the Fant heirs.

(10) On February 9, 1880, J. J. Parker filed an application with J. J. Cocke, the county surveyor of Cameron county, for a survey of five sections of land, and again on April 23, 1880, for 12 sections, on land included in the Abajo as surveyed by him for the heirs of Villareal. Those files were abandoned, and in lieu thereof said Parker on November 9, 1881, filed the following application:

"Santa Rosa, November 6th, 1881.

"J. J. Cocke, Esq., Surveyor of Cameron Co. Tex.—Sir: You will please cause to be surveyed for me as soon as possible (5) five alternate land certificates in alternate sections of the Central & Montgomery R. R. Co., Nos. 368, 369, 370, 371, and 372, locating the same upon the east side of a portion of a tract of land in Cameron county, Texas, known as Santa Rosa de Abajo, lying adjoining upon the eastern side of the tract of land known as Santa Rosa now occupied by me; and also survey for me in alternate sections the (12) twelve alternate land certificates of the Gulf, Colorado & Santa Fé R. R.

Co., Nos. 1085, 1086, 1087, 1089, 1090, 1091, 1092, 1093, 1094, 1095, and 1096, surveying and locating the last-mentioned twelve certificates upon the western portion of said tract of land known as Santa Rosa de Abajo, in said county of Cameron and state of Texas, all of which said certificates are on file in your office.
"[Signed]            F. J. Parker."

(11) By virtue of these certificates and two other alternate certificates, J. J. Cocke, county surveyor of Cameron county, surveyed for F. J. Parker 19 sections, with their alternates for the school fund, and the field notes thereof were filed in the land office January 25, 1882. The said 19 sections and alternates cover the Abajo as its location is claimed by appellees.

(12) The 19 sections above referred to were patented October 10, 11, 12, 13, and 31, 1888.

(13) Nine of said alternate sections are claimed by the defendants referred to in the opinion herein as the purchasers from the state.

(14) In 1859, F. A. Blucher, county surveyor of Cameron county, by virtue of the act of 1852, surveyed, for parties claiming to be the owners thereof, La Parra, El Paistle, and Arriba, and said grants were patented as surveyed by him.

(15) El Paistle and Las Barrosas were surveyed for Mifflin Kenedy, who procured patents on same as surveyed by Blucher.

(16) Blucher's surveys located La Parra, El Paistle, Arriba, and Las Barrosas as claimed by appellees.

(17) On May 29, 1882, Mifflin Kenedy conveyed to the Kenedy Pasture Company the Paistle and Barrosas surveys, describing the same as described in their patents.

(18) At the time Canales made the Abajo survey, Pedro Villareal was in possession of the same, and remained in possession, in person or by agents, using the same for grazing stock, until 1850 or 1860, since which time no one claiming under said Villareal has occupied or been in possession of said tract of land or any part thereof, and the evidence does not show that Villareal, or his heirs or assigns, have ever paid any taxes thereon.

(19) In 1878, or prior thereto, F. J. Parker erected a fence approximately along the west line of Abajo, as claimed by appellees, extending the same so as to inclose the Arriba and other lands to the west, then claimed by Parker.

(20) In 1883 the Kenedy Pasture Company erected a fence along the west line of the El Paistle as herein claimed by it, inclosing that survey and other lands owned by it to the east.

(21) In 1886 the Kenedy Pasture Company erected a fence along the north line of Las Barrosas as patented.

(22) Eleven sections claimed by the purchasers from the state lie west of the Abajo as claimed by appellees, but are included

in said survey, if the same be located as claimed by appellants.

(23) The Kenedy Pasture Company is the owner of El Paistle and Las Barrosas; John G. Kenedy et al. have a chain of title from the heirs of Pedro Villareal to the Abajo grant; the Fant heirs are the owners, under a regular chain of title from the patentee to the 19 odd sections located by Parker, and also of the Arriba. The purchasers from the state bought upon condition of settlement, paying 1/40 of the purchase money. They have completed their occupation and made proof of the same, and their purchases are in good standing in the land office.

(24) Of the even-numbered sections located by Parker for the school fund, sections 2, 80 and 82, and 84 were sold to persons not parties to this suit, but such sales were canceled. Sections 52, 56, and 58 were sold to Dayton Moses as detached school land. Sections 4 and 60 have never been sold by the state. Section 68 has been sold by the state, and is now owned by the Kenedy Pasture Company.

The court fixed the boundaries of El Paistle and the Santa Rosa de Abajo as claimed by the state, the Fant heirs, and the purchasers from the state, and rendered judgment in favor of said parties for all of the lands claimed by them, respectively, except as to sections 2, 80, 82, 84, 62, 65, 58, and 68, as to which sections it rendered judgment against the state on the ground, as to all of said sections still owned by the state, that Pedro Villareal acquired an equitable title from the state of Tamaulipas to the Abajo survey, which is good as against the state, but not good as against those who held under patents from the state, and as purchasers for value, without notice.

Such additional facts as are necessary to be found in order for a decision of the issues herein will be stated in the opinion.

## Opinion.

By reason of the size of the record and the importance of the questions involved in this case, our opinion herein will necessarily be lengthy. There are 1103 pages of the record and statement of facts, and the briefs aggregate 991 pages.

We will first consider the issue of boundary. The trial court found the boundary of the Abajo survey to be as claimed by the appellees. We think that the evidence sustains this finding. We shall not undertake to set out all of the evidence on this issue, but only enough to show our reason for the conclusion which we have reached.

As Abajo joins El Paistle, and El Paistle joins La Parra, it is important to ascertain the western boundary of La Parra. Both the original field notes of La Parra, and the field notes of the same as surveyed by Blucher, call for La Parra to begin at Paso Ancho (wide crossing), on Olmos creek, for its north-

west corner. There is no controversy as to where Blucher located this corner, but appellants say that this is not the original corner, for the reason that it is not on Olmos creek, but on a lagoon or lake into which Olmos empties. The evidence of French, a surveyor, familiar with the country, and witness for appellants, on this point is:

"I should not call it Olmos creek where Paso Ancho is placed (by Blucher), still one might call it Olmos creek. It is hard to say where the creek ends and the lagoon begins."

It is shown that there is a crossing, about a mile up the creek, where appellants claim Paso Ancho to be, and it was the opinion of all of the witnesses who testified on this point that the water was too deep to be crossed where Blucher placed Paso Ancho. There are old roads that lead to the creek or lagoon where Blucher placed Paso Ancho, but they lead up the creek and cross at or near where appellants claim Paso Ancho to be. The crossing here is not confined to one place, but covers a space of a quarter of a mile. French testified that it was the custom in Spanish surveys to name a corner for some natural object in its vicinity, if there was one, and that these objects were sometimes a half mile or a mile from the corner.

The most material facts which support the finding of the trial court as to the location of Paso Ancho are:

[1] (a) The original S. E. corner of La Parra is a known corner. There is nothing to identify its S. W. corner. If a line be run south from the true N. W. corner of said survey to intersect a line run west from its S. E. corner, the point of intersection will be the S. W. corner. Randall v. Gill, 77 Tex. 354, 14 S. W. 134; Forbes v. Withers, 71 Tex. 307, 9 S. W. 154; State v. Palacios, 150 S. W. 238, on motion for rehearing. Assuming Paso Ancho to be where Blucher placed it, and running south to the intersection of the south line, the west line of La Parra as measured by Maddox is 20,130 vrs. Its original field notes call for it to be 18,750 vrs.—excess in Blucher's line 1,380 vrs., as measured by French 1,250 vrs. Assuming Paso Ancho to be where appellants claim it to be, and run south to the intersection of the line run west from the S. E. corner of La Parra, the excess is about 3,000 vrs.

The explanatory map of Fuentes, made a part of his field notes, shows that a body of water comes into the creek from the southwest at Paso Ancho. This body of water is shown on all of the official maps, dating back from the first of such maps. There is such a body of water at Paso Ancho as located by Blucher, but there is no such body of water at any point above on Olmos creek.

The Fuentes field notes of La Parra call to run from its S. W. corner west 8,000 vrs. arrived opposite the Mayote (Motte) de Tio Cullas. This motte was evidently a prominent and well-known object when the original survey was made, and has remained such

to the present time. The official under whose direction La Parra was surveyed says:

"I, the said Judge, * * * proceeded to the inspection of the place called La Parra (a place where vines grow upon stakes or a wall) and Motos de Tio Cullas, directing myself from north to south to the place San Joaquin (S. W. corner of La Parra), and thence from west to east to the Moyote de Tio Cullas, I saw that the land is prairie," etc.

Judge James B. Wells, one of appellants' attorneys, who is shown to be familiar with that section of the country, testified that Tio Cullas "is a well known motte, familiar to every one in that country, so far as I know."

The call for this motte fits the distance from the S. W. corner of La Parra as found by Blucher, but, as said corner is claimed by appellants, the distance to said motte is excessive by about 1,900 vrs.

The field notes of Abajo call for Mirasoles (sunflowers) for its N. E. corner, and Alcatraz (pelican) for its N. W. corner. Mirasoles is also called for as the N. W. corner of El Paistle. Sunflowers grow along the bank of the creek generally, and nothing is found resembling a pelican. So the names of these corners do not aid in their identification. The field notes of Abajo consist of the following sketch and explanation thereof made by Canales:

The figures 44, 310, etc., on said sketch indicate cords. A cord is 50 vrs. Beginning at Miraflores, as located by Blucher, and found by the trial court, point "a" on the sketch, and running thence south 2,2000 vrs., and thence west, Olmos creek will be crossed at 1,400 vrs.; and to continue said line west, and thence south and west, as shown by the sketch, it would remain on the north side of the creek, and place the N. W. corner north of the creek. On the other hand, beginning at Miraflores, as placed by appellants, and running south 2,200 vrs., thence west 6,950 vrs., thence south 500 vrs., and thence east 1,516 vrs., as shown by the sketch made by Canales, the end of the second line will not be on the creek, but south of it about 600 vrs., and Alcatraz, as thus placed, will be about 1,200 vrs. south of the creek.

Beginning at Alcatraz, as found by the court, and reversing the calls shown on said sketch, they practically fit the calls for the creek, except that the last call must be extended about 800 vrs. to reach the creek at the N. E. corner. Beginning at Alcatraz, as claimed by appellants, and reversing the calls, would put the end of the second run about 700 vrs. north of the creek, and the last run made to the creek would be too short by about 1,000 vrs. By reversing the calls from Alcatraz, as fixed by the court, or, what amounts to the same thing, extending the call south from the point "a" about 800 vrs., the survey will conform to the description given it by Canales, viz. a hexagon and triangles. It cannot be made to conform to this description if Mirasoles and Alcatraz be placed where appellants claim them to be.

The Canales sketch shows that the length of the west line exceeds the length of the east line by 2,700 vrs. As fixed by the court, the lengths of these lines lack only 90 vrs. of fitting these calls, which is as near as any two sets of chain carriers could measure, considering the lengths of the lines. These lines, if Mirasoles and Alcatraz be located as claimed by appellants, will lack 1,621 vrs. of fitting these calls. The Canales sketch explains the difference in the length of these lines by showing that Mirasoles is below a long bend of Olmos creek. There is but one such bend in this creek, and, to conform to the field notes of Abajo, Mirasoles must be placed below it. The trial court so placed it. As placed by appellants, Mirasoles is above this bend.

The evidence shows that there are large rocks buried in the ground almost even with the surface at the places where appellants claim Paso Ancho, Mirasoles, and Alcatraz to be—when and by whom so placed is not made to appear. The testimony of some of the Mexican witnesses would have justified the finding, if they were believed, that these rocks had been in their present positions since 1864 or 1865. How much credence the trial court gave to this testimony we are

unable to say. Cocke, who ran out these surveys in 1883 for Mifflin Kenedy, and placed their corners as now claimed by appellants, did not find any of these rocks, which raises the suspicion that they were placed where now found to conform to Cocke's survey. No rocks at corners are called for in the original field notes. The J. J. Cocke above referred to is the same surveyor who in 1879 surveyed the Abajo for Col. Craft, agent of the heirs of Villareal, and placed its corners as found by the trial court.

There is material testimony in the record with reference to the Arriba which supports the finding of the court on the issue of boundary, but we do not deem it necessary to set it out, as, in our opinion, the evidence is sufficient to sustain the finding of the trial court upon the issue of boundary without reference to the Arriba.

[2] Appellants assign error upon the admission of an affidavit made by Blucher in 1871 as to what he found when he made the Arriba survey, the grounds of such objection being that it is hearsay, ex parte, and conclusions of the affiant. The court qualified appellants' bill of exceptions by showing that he stated at the time that same was introduced that he would not consider any part of said affidavit, except the statements of Blucher as to what he did and found in making the original survey, and that he did not do so. Blucher made the resurvey of the Arriba in 1859. He was dead at the time of the trial herein. He was disinterested. For these reasons we think that the declarations of Blucher contained in said affidavit as to where he located the lines and corners of the Arriba when he made the same were admissible. Simpson v. De Ramirez, 50 Tex. Civ. App. 25, 110 S. W. 149; Stanus v. Smith, 8 Tex. Civ. App. 685, 30 S. W. 202; Ayers v. Harris, 77 Tex. 115, 13 S. W. 768; Tucker v. Smith, 68 Tex. 478, 3 S. W. 671.

The Blucher affidavit is a sworn report made by him to the commissioner of the land office with reference to the true location of the lines and corners of the Arriba survey by reference to the objects found by him in his original survey and in a subsequent survey made by him.

[3] If, however, it be conceded that it was error to admit the Blucher affidavit, which has reference only to the Arriba survey, we do not think this case should be reversed for that reason. We do not think that it is probable that the finding of the court as to boundary would have been otherwise than it was had the affidavit of Blucher not been offered in evidence.

### Boundary by Estoppel.

If the Abajo and Barrosas and El Paistle are located as found by the trial court, the sections and parts of sections lying between a line drawn south from Mirasoles, as claimed by the appellants, to the north line of Las Barrosas, and west of a line so run

from Mirasoles, as claimed by appellees, are located on the Abajo survey; but the claimants under said survey are estopped from so claiming herein for the reason that they have alleged that the Abajo lies west from a line run south from Mirasoles, as claimed by them and accurately described in their pleadings and clearly identified by the evidence.

If, on the other hand, El Paistle and Las Barrosas are located as claimed by appellants, the sections and parts of sections lying between the lines above described are upon said surveys. But, if this be true, the Kenedy Pasture Company is nevertheless estopped from claiming said sections and parts of sections as against such of the appellees, if any, who are purchasers of same for value, without notice that the same were included in said surveys.

[4] Where the owner of a Mexican grant, the location of the lines and corners of which is uncertain, has had the same resurveyed, as he was authorized to do under the act of 1852 confirming such grant, and has the field notes of such resurvey returned to the land office, and has applied for and accepted a patent to such grant in accordance with the field notes of such resurvey, this amounts to a declaration by him to the state and to all the world that he claims under said grant the lands described in his patent and none other; and, as against an innocent purchaser of lands outside of that described in his patent, he is estopped to claim the same, though they be in fact within the bounds of his grant as originally surveyed by the Mexican government. Sullivan v. State, 41 Tex. Civ. App. 89, 95 S. W. 648; Hamilton v. State, 152 S. W. 1121; Forbes v. Withers, 71 Tex. 306, 9 S. W. 154; Timon v. Whitehead, 58 Tex. 290; Land Co. v. Gardner, 25 S. W. 737; New York Land & T. Co. v. Gardner, 11 Tex. Civ. App. 404, 32 S. W. 786; Hefner v. Downing, 57 Tex. 581; Welder v. Hunt, 34 Tex. 44; U. S. v. Roselius, 15 How. 31, 14 L. Ed. 589; West v. Cochran, 58 U. S. (17 How.) 403, 15 L. Ed. 115; De Arguello v. U. S., 59 U. S. (18 How.) 539, 15 L. Ed. 481.

[5] The hypothetical case above stated is met by the facts of this case. In 1859 Mifflin Kenedy, claiming to be the owner of El Paistle and Las Barrosas, had them resurveyed by Blucher, the county surveyor of Cameron county, who located the same as claimed by appellees, and plainly marked the corners, and such corners are plainly identified by the evidence herein. In making such resurveys Blucher acted as the agent of Kenedy. Sullivan v. State, 41 Tex. Civ. App. 89, 95 S. W. 648. The field notes of said resurveys were recorded in the office of the county surveyor of Cameron county, and were returned to and filed in the land office, and Kenedy applied for and received patents to said surveys as thus resurveyed, and expressed himself satisfied therewith as late as 1883. Mifflin Kenedy, on May 29, 1882, conveyed these lands to the Kenedy Pasture

Company as patented, and through said deed the said Pasture Company is claiming herein under said patents. In 1879 F. J. Parker, without any knowledge that any one claimed the boundaries of said surveys, located 19 alternate certificates owned by him on land adjoining said surveys as the same were patented. The Fant heirs and the purchasers from the state are the owners of the sections and fractions of sections involved herein, and located upon El Paistle and Las Barrosas, if said surveys are located as claimed herein by the Kenedy Pasture Company. They are purchasers for value and without notice that such sections and parts of sections were included in the El Paistle and Las Barrosas, if such be the fact.

### The Crocker Sections.

If we are correct as to the boundaries of the Abajo survey, it follows that the judgment of the trial court must be affirmed as to sections 1 to 11, inclusive, claimed by the Crockers, for the reason that said sections are not included within the bounds of said survey.

### Innocent Purchasers.

The court found that the heirs of Villareal, and those claiming under them, had an equitable title to the Abajo survey; and it is the contention of appellants that the court should have found that the location of the certificates thereon was void under the provisions of section 2, art. 14, of the Constitution of 1876, which provides that land certificates shall not hereafter be located "upon any land titled or equitably owned under color of title from the sovereignty of the state," etc. Had this been all of the article referred to, if the court was correct as to said parties having an equitable title, it should have held against appellants on the issue of good faith, for the reason that the title under which they held was against the law, of which they were bound to take notice. But the remainder of said article is as follows: "Evidence of the appropriation of which is on the county records or in the general land office."

[6] A grant was issued to Pedro Villareal by the Governor of the state of Tamaulipas in 1848. This grant was void, and therefore conveyed neither legal nor equitable title. State v. Bustament, 47 Tex. 320; Haynes v. State, 85 S. W. 1042; Reese v. Cobb, 135 S. W. 224.

[7] If Villareal had an equitable title to the Abajo survey, he obtained the same by reason of having it surveyed and paying the government dues thereon prior to 1836. State v. Gallardo, 106 Tex. 274, 166 S. W. 369. Copies of a number of letters written by officials in Mexico were read in evidence for the purpose of showing such survey and government dues. None of these were ever recorded in Cameron county or filed in the land office, nor did any of appellees ever hear of them until this trial. A legal survey of public domain is an appropriation of same.

If such a survey was made for Villareal, and followed by the payment of government dues, was the evidence of such appropriation on the county records of Cameron county in the general land office in 1881, when the location and surveys of the 19 alternate sections were made? Appellants contend that it was, for the reason that said grant had been filed by Col. Craft, as agent for the heirs of Villareal, with the county clerk of Cameron county, who had copied the same in the deed records, and with the county surveyor of said county, who resurveyed the Abajo by virtue of said grant, and forwarded the field notes to the land office, and they were there filed December 31, 1879. There is no evidence that any of the appellees ever saw this grant. It was never filed in the land office. A certified copy thereof from the copy in the deed records of Cameron county was filed in the land office February 3, 1887.

[8, 9] The Abajo grant being void, the county clerk of Cameron county had no authority to record the same, the county surveyor had no authority to make a survey by virtue thereof, and the field notes so made and returned to the land office did not become archives of that office. When the Constitution declared that, in order to render a location void when made upon "land titled or equitably owned, evidence of the appropriation of which was on the county records or in the General Land Office," it meant *legal* evidence. There was no such evidence on the county records of Cameron county, nor in the general land office, when Parker made his files, nor has there been any such since that time. The record of a void grant is illegal, and is not notice of its contents. Hayden v. Moffatt, 74 Tex. 647, 12 S. W. 820, 15 Am. St. Rep. 866; Taylor v. Harrison, 47 Tex. 457, 26 Am. Rep. 304; Bank v. Johnson, 5 Tex. Civ. App. 535, 24 S. W. 351; Daugherty v. Yates, 35 S. W. 940; Terry v. Cutler, 14 Tex. Civ. App. 520, 39 S. W. 152; Keenon v. Burkhardt, 162 S. W. 487; Lewis v. Barnhart, 145 U. S. 56, 12 Sup. Ct. 772, 36 L. Ed. 630.

[10] It is contended by appellants that Parker and the Fant heirs had notice of such facts in reference to the Abajo survey as should have put a reasonable man on inquiry. These facts, with reference to Parker, are that he was the owner of the Arriba, the field notes of which showed that the inset on the east side of said survey was conceded to the party for whom the Arriba was surveyed by Pedro Villareal. This would indicate that Villareal had some kind of a claim to said land, but the grant to the Arriba subsequently made recited that it was bounded upon the east by vacant land. This would indicate that the Villareal claim was not such as the government recognized, or that it had been abandoned. Also that Parker was informed by the county surveyor of the survey

recently made for Col. Craft, as the agent of the heirs of Villareal. Inquiry as to this matter would have led only to the void record of the void grant in the county clerk's office, which, if he had read, would have been no notice of the alleged facts therein recited, or to the void field notes in the surveyor's office and in the land office.

The facts which it is insisted should have put the Fant heirs upon notice are that the deed from Chas. E. Parker, the heir of F. J. Parker, to D. R. Fant and the Driscols; and also the deed from the Driscols to Fant recites that the land therein conveyed is "upon a Spanish grant in the name of Pedro Villareal, the said lands under said grant having become forfeited to the state and became liable to the laws of the state governing the public domain." Under the facts as shown in the record, this recital was not calculated to excite any suspicion as to the title of the land conveyed to them. Graham v. Hawkins, 1 Posey, Unrep. Cas. 514. Had their suspicions been excited, they could not, by any reasonable diligence, have found any legal evidence of Villareal's equitable title. There is no such evidence in the record, unless it be the letters found by Pierce, an expert in Spanish land titles, and familiar with the Spanish language, after a 10 years' search in various towns in Mexico. Slayton v. Singleton, 72 Tex. 214, 9 S. W. 876.

[11] The reference in the deed above referred to was to a "grant" which, if valid, would have conveyed a *legal* title. It did not put the grantees upon notice of the *equitable* title herein asserted in behalf of Villareal. Middleton v. Johnston, 110 S. W. 792; Fire Association v. Flournoy, 84 Tex. 636, 19 S. W. 793, 31 Am. St. Rep. 89; Wiseman v. Watters (Sup.) 174 S. W. 816; Wethered v. Boon, 17 Tex. 149; Bacon v. O'Connor, 25 Tex. 226.

[12] The court found that both the Fant heirs and the purchasers from the state were purchasers for value. The evidence is sufficient to sustain this finding. The 19 sections claimed by the Fant heirs are patented, and consequently the Fant heirs have the legal title. The burden is on him who asserts a prior equitable title as against a legal title to prove that the holder of the legal title did not pay value. Teagarden v. Lumber Co., 105 Tex. 620, 154 S. W. 973; Sparks v. Taylor, 99 Tex. 421, 90 S. W. 485, 6 L. R. A. (N. S.) 381; Johnson v. Newman, 43 Tex. 642; Lumber Co. v. Smith, 185 S. W. 1071; Delay v. Truitt, 182 S. W. 735; Fordtran v. Perry, 60 S. W. 1002; Peterson v. McCauley, 25 S. W. 829. There is not the slightest evidence in the record to show that the Fant heirs did not pay full value.

[13] As to the purchasers from the state, the contention is that, inasmuch as they have paid only 1/40 of the purchase price, they are only pro tanto purchasers for value. There is no offer upon the part of the Villa-

real heirs and those claiming under them to pay to the purchasers from the state the 1/40 of the purchase money, or to allow them a 1/40 interest in the land, in the event it should be shown that they purchased without notice of the Villareal title, nor in any manner to adjust the equities with such purchasers. Groesbeeck v. Crow, 85 Tex. 200, 20 S. W. 49. Besides, "a valuable consideration may be other than the actual payment of money, and may consist of acts to be done after the conveyance." Stanley v. Schwalby, 162 U. S. 276, 16 Sup. Ct. 763, 40 L. Ed. 967. A very material part of the consideration demanded by the state was actual settlement and continued residence for a period of three years. This the purchasers from the state have complied with, and it would be difficult to estimate what sum of money would compensate them for so doing.

For the reason that we think the evidence sustains the finding of the trial court that all of appellees, except the state, are innocent purchasers for value, without either actual or constructive notice of the alleged equitable title of the heirs of Villareal and those claiming under them, we overrule all of appellants' assignments which assail said finding.

The court found that all of the appellees, except the state, had acquired title to the lands claimed by them, respectively, under each of the statutes of limitation of three, five and ten years, and also that the Kenedy Pasture Company had not acquired title under either of said statutes. The evidence upon these issues is voluminous, and, on account of the great length to which this opinion has already unavoidably attained, we shall not here set out any part of said evidence, but will simply state that we think the evidence is sufficient to sustain such findings.

### Cross-Assignments.

All the appellees have filed cross-assignments herein, but as the court found in favor of all of them except the state, and as we have reached the conclusion that said judgment should be affirmed as to the appellees in whose favor such judgment was rendered, it is unnecessary for us to pass upon the cross-assignments except as urged by the state.

[14] The state assigns error on the action of the court in permitting J. G. Kenedy et al., claimants under Pedro Villareal, to file a trial amendment after the case had been on trial for 10 days; the ground of such objection being that said appellants had specially pleaded their title, viz. a legal title by virtue of the grant to Villareal in 1848; that the trial amendment alleged an equitable title; and that the same was not made in response to any ruling of the court on the pleadings, but solely for the purpose of rendering admissible evidence as to an equi-

table title which they had not theretofore pleaded.

We agree with the contention of the state that appellants Kenedy et al. had specially pleaded that they had a legal title to the Abajo survey by virtue of the grant made to Villareal in 1848, which was attached as an exhibit to their answer, and that the trial amendment set up an equitable title.

Article 1824, R. S., provides that all amendments to pleadings shall be filed "before the parties announce ready for trial, and not thereafter." This statute is plain and unambiguous, and seems to use mandatory language; but the Supreme Court has held that this statute was directory only, and that it is in the discretion of the court to permit amendments to be filed after announcement of ready for trial. Ry. Co. v. Goldberg, 68 Tex. 685, 5 S. W. 824; Radam v. Microbe Co., 81 Tex. 122, 16 S. W. 990, 26 Am. St. Rep. 783; Boren v. Billington, 82 Tex. 137, 18 S. W. 101; Canal Co. v. McFarland, 94 S. W. 402; Cahn v. Oldag, 132 S. W. 102; Pitzer v. Decker, 135 S. W. 161; and many others.

The Supreme Court has further recognized the right of the trial court to permit pleadings to be amended after the trial had been begun, and that without withdrawing announcement for trial, by rule 27 (142 S. W. xix) for the government of district and county courts. It is true that the amendment here is called a "trial amendment," but it is nevertheless an amendment of the pleadings. Such holding no doubt contributes to the ends of justice, and as the Supreme Court is the final arbiter as to what construction should be given to a statute, in view of the repeated decisions of this subject, we overrule the assignments of error on this point.

The next cross-assignments which we will discuss are those which complain of the action of the court in admitting in evidence copies of certain letters purporting to be from certain officials to certain other officials in Mexico.

[15] These letters, though certified by their official custodian at Reynosa, Mexico, were not admissible as certified copies, for the reason that this matter is governed by statute, and they do not come within the terms of the statute making certain certified copies of instruments admissible in evidence. R. S. arts. 3694–3700; Freeman v. Rice Inst., 60 Tex. Civ. App. 191, 128 S. W. 631; Shifflet v. Morelle, 68 Tex. 388, 389, 4 S. W. 843.

[16] But the letters were offered as examined copies, and presumably it was upon this ground that they were admitted. They were not admissible without some extrinsic evidence of their genuineness. Word v. McKinney, 25 Tex. 269; Schunoir v. Russell, 83 Tex. 95, 96, 18 S. W. 484; Sullivan v. Fant, 160 S. W. 612, 613; Lumber Co. v. Gwin, 52 S. W. 112. The proof should have been such as to reasonably satisfy the court that the letters were written by officials to officials in their official capacities, and in the line of their official duties, which includes the fact that the signatures thereto were genuine.

[17] Frank Pierce, who compared the copies with the original, is a lawyer whose specialty is, and for many years has been, the examination of Mexican land titles. He speaks, reads, and writes the Spanish language. He lived in Matamoras, Mexico, from 1862 to 1881, and since that time has resided in Brownsville, on the Texas-Mexican border. He has examined all of the records pertaining to land titles in more than 20 cities and towns in Mexico. He testified that he knew from the history of that country, and from the examination of many official documents, that the parties whose names were signed to the letters in question held the respective offices indicated therein at the respective dates thereof. We think this testimony, under the circumstances of this case, is sufficient proof of the official character of such parties in 1832–34. Indeed, it would be difficult, if not impossible, to produce better testimony of such fact at this time.

Pierce testified as to the genuineness of the handwriting of the original letters by comparison. It is objected that the genuineness of the signatures with which the comparisons were made was neither proven nor admitted. But were they not proven? Not by any one who ever saw either of these parties sign his name; but this is not necessary in all cases. U. S. v. Ortiz, 176 U. S. 429, 20 Sup. Ct. 466, 44 L. Ed. 532. Pierce testified that he found these papers in the municipal building at Reynosa, in the files where the correspondence between officials should have been and were kept, and in the custody of the proper officer; that they had the appearance of being very old; that he had read many public and official documents purporting to be signed by said parties, and in this way he knew their handwriting, and that the names signed to these letters were genuine signatures of the parties whose names purported to be signed thereto. The facts in this case as to Pierce's qualification to testify to the signatures of those parties are similar to those in U. S. v. Ortiz, supra, which quotes with approval the principle announced in Rogers v. Ritter, 12 Wall. 317, 20 L. Ed. 417, "Where," says the court, "it was held that witnesses who, in the course of administration of the duties of an official position, had acquired a familiarity with a certain signature, although they had never seen the party write and had never corresponded with him, were competent to express an opinion on the subject of the genuineness of a signature purporting to have been made by that person." We do not think that the fact that Pierce did not examine the documents referred to by him in an official capacity can make any dif-

ference in the application of the principle announced in the cases above cited. Taking a common-sense view of the matter, it would be absurd to suspect that some person, many years ago, who, so far as the record discloses, would have had no interest in so doing, wrote letters, relating to official matters, forged the names of officials thereto, and succeeded in getting them placed in official files, where they have ever since been kept by the legal custodian of such files.

For the reasons stated, we overrule the state's assignments of error as to the admission of the examined copies of the letters referred to, on the grounds that the official characters of the writers and the genuineness of their signatures were not shown.

The state, under appropriate assignments, urges the further objection to the introduction of these letters, for the reason that they did not appear with sufficient certainty to relate to Villareal's survey of the land in question, nor to the payment by him of the purchase money therefor, and were therefore immaterial and irrelevant to any issue in this case.

It must be conceded that the letters do not clearly prove either the survey or the payment of the purchase money, but, if they tend to do so, they were admissible in evidence, especially as it appears that by reason of the destruction of the records at Victoria by the French soldiers in 1865, and the loss or destruction of the protocol, better evidence on these issues is not obtainable.

[18] The letters from Canales simply notify parties that he would make surveys at Santa Rosa at about the time he did survey Santa Rosa de Arriba. As stated in our findings of fact, we find that Canales surveyed the Arriba, the Abajo, and El Paistle at about the same time. Such being the fact, the introduction of letters from Canales stating that he expected to make surveys in that section at about that time, if inadmissible, are harmless. The same is true of the letters signed by George Cavazos and Pedro de la Garza, and one letter not signed, all of which are notices that surveys will be made at Santa Rosa.

Our finding that Canales surveyed the Abajo is based upon the fact that the Arriba calls for the inset in the Abajo, indicates the existence of such a survey at that time, and upon the occupancy of said survey by Villareal from about that time to some time between 1850 and 1860, and upon the testimony of Judge Wells, who saw the original field notes attached to the grant of 1848, and testified, without objection, that he was familiar with the signature of Canales, and that these field notes were in his handwriting and were signed by him. While the record of these field notes in Cameron county was not constructive notice of their existence, for the reason that they were attached to the void grant, and were recorded as a part thereof, yet their being so attached furnishes no objection to their being proven by one who was familiar with the handwriting of Canales.

We think that the letters signed "B. M. C." and the letter signed "J. Anto. Leal, Jany 14—33," and addressed to the Alcalde at Matamóras, should not have been admitted in evidence, for the reason that, taken either singly or in connection with the other letters, or any other testimony in this case, they do not appear to refer to Pedro Villareal, nor to the Abajo survey; but the admission of these letters was harmless error.

Taken in their chronological order, the letters which we think material are: (1) The letter from the Inspector General Lorenzo Cortinas to Jose Antonio Leal, alcalde of Reynosa, January 14, 1833, as follows:

"Being scarce of finances to expend for the pressing necessities of the division, and being informed that in this town are some funds arising from lands, which have been surveyed and denounced, I hope that you will please take such steps, so that if they have not made their payments they will do so at once, and you can give the interested parties a receipt for the money as a proof of payment, and so they can present themselves to the government for their titles.

"I anticipate, from your accustomed zeal, that you will again give me this assistance, of which I have already advised his excellency, the governor of the state, for his information.

"Reiterating to you my esteem and consideration.

"God and liberty, Reynosa, Jan. 14, 1833.
"[Signed]                    Lorenzo Cortinas.
"To Alcalde Don Jose Antonio Leal."

The reply of Leal on same day, as follows:

"Referring to yours of this date, I beg to inform you that of the individuals for whom there were demarked lands in this jurisdiction by my predecessor, the citizen alcalde, some are a great distance from here, and for that reason I cannot comply as quickly with your order as I desire, as they have not paid into this court the amount of the value of their lands; but I have issued the necessary notices that they pay on the table of this court the sums belonging to the public treasury of the state, and as soon as this is done the total sum will be placed at your disposition.

"I tell you this in answer to your letter, and at the same time to reiterate my respect and esteem for you.

"God and liberty, Reynosa, Jan. 14, 1833.
                              "J. Anto. Leal de Leon.
"Mr. Inspector General of the State, Don Lorenzo Cortina."

The letters from Leal to the governor, May 5, 1833, as follows:

"Your Excellency: I send you by the bearer, citizen Ignacio Agado, four expedientes (records) of lands demarked in this jurisdiction, in favor of the citizens Yreneo, Pedro Villareal, Leonardo Longoria, and Gabriel Trevino, and the value of which lands were received by the inspector general, Lorenzo Cortina, as you will observe from the receipt which is attached to each expediente, and I request that the treasury is satisfied that your excellency will show your superior approval thereof by issuing the respective titles.

"I take this occasion to express to you my esteem and consideration.

"God and liberty, Reynosa, May 5, 1833.

"J. Anto. Leal de Leon."

"By the bearer, citizen Ignacio Agado, this corporation sends to the general treasury of the state the sum of three hundred and forty-three dollars, three reales, and eleven grains, resulting from the collections under the treasury law for the past year, advising you that we have not paid the bearer his charges for this trip, as he stated that he would leave it to the discretion of yourself and the supreme government.

"For this reason this body expresses to you its great esteem and consideration.

"God and liberty, May 5, 1833.

"J. Anto. Leal de Leon."

Letter from Ramon de Cardenas, governor of Tamaulipas, to the alcalde of Reynosa, August 8, 1834, as follows:

"Government of the State of Tamaulipas: You will please notify the citizens Yreneo Gomez, Juan Antonio Balli Cavazos, Gabriel Trevino, Pedro Villareal, and Leonardo Longoria y Garza to present themselves at this office, in person or by some person at their expense, so as to hasten the conclusion of the expedientes of their denouncements on vacant lands, which were forwarded here by your court, advising them that only this step is pending for the expediting of the titles of ownership, which should issue in their favor, in conformity with the colonization law.

"Regarding the expediente of the citizen Juan Antonio Balli, it is necessary to state that notwithstanding it was sent under date of December 22, 1832, together with the hundred and fifty dollars, the price of the five sitios of land for large stock, which were surveyed and demarked by the surveyor, still, by the expediente, it appears that the same has not been paid into the treasury, and for this reason it is necessary that the interested party should understand this, so that he can overcome the difficulty or present himself with the indicated sum.

"God and liberty, City of Victoria, August 8, 1834.        Ramon de Cardenas.

"G. Arcos, Secretary.

"To the Alcalde of the Town of Reynosa."

Reply to same by said alcalde B. M. Cavazos, Sept. 30, 1834, as follows:

"Your Excellency: In conformity with your letter of the 8th day of last August, the citizens Juan Antonio Balli y Cavazos, Gabriel Trevino, and Pedro Villareal have been requested to present themselves in person or by attorney at this capitol to conclude the 'expedientes' which they have pending upon lands denounced by them, and Balli y Cavazos was notified that the one hundred and fifty dollars mentioned in his 'expediente' have not reached the treasurer, and for that reason it is necessary that he do so for its conclusion.

"I reiterate my distinguished appreciation and respect of yourself.

"God, etc., Reynosa, September 30, 1834.

"B. M. Cavazos.

"To the Governor of this State."

The first of these letters shows that the inspector general had been informed that vacant lands had been surveyed and denounced in the jurisdiction of Reynosa, and urges him to collect the money, if he had not already done so, and pay same into the treasury. The next is a reply from the alcalde, saying that he has notified the parties to make their payments. Neither of these letters names Villareal or the Abajo survey; and, if there was nothing else in the record from which it might be inferred that the Villareal and Abajo surveys were included in the matters referred to, they would not be admissible. Those letters are dated January 14, 1833. On May 5, 1833, the alcalde of Reynosa wrote two letters to the governor of Tamaulipas, which the trial court was justified in presuming related to the parties referred to in the correspondence between the inspector general and the alcalde. In one of these letters the alcalde says that he sends the expedientes of Yreneo Gomez, Pedro Villareal, Leonardo Longoria, and Gabriel Trevino; and in the other, written the same day, he says that he sends by the same party a certain amount of money. It may fairly be presumed that this money was sent as payments on the lands referred to in the expedientes, one of which was for Pedro Villareal. In the letter supra, of August 8, 1834, the governor writes to the alcalde to notify the four parties mentioned in the alcalde's letter of May 5, 1833, that all that is necessary for those parties to do in order to receive their final title was to present themselves and receive the same. This necessarily implies that their payments of purchase money had been received in the treasury. This presumption is strengthened by the statement in this letter that another party, Juan Balli, to whom La Parra was subsequently granted, had not paid the purchase money due from him into the treasury, and that it was necessary for him to do so, "so that he can overcome the difficulty," evidently meaning remove the objection to his receiving his grant. The alcalde, replying to this letter, states that Balli's payment has reached the treasury, and he, together with Gabriel Trevino and Pedro Villareal, have been notified to present themselves and receive their titles. The names of Yreneo Gomez and Leonardo Longoria are mentioned in the alcalde's letter of May 5th, are omitted from this letter, perhaps for the reason that they resided in the jurisdiction of Matamoras, though their surveys were in the jurisdiction of Reynosa.

It is urged as an objection to the admission of these letters that, while Pedro Villareal is mentioned therein, the Abajo survey is not mentioned; and that therefore, if it be conceded that he paid for some land, it does not appear from these letters that he paid for the Abajo survey, and, inasmuch as it appears from the record that another grant of three and a half leagues was made to a party of that name (Pedro Villareal), the reference in these letters might have been to that grant. The answer to this is that the latter grant was on the Rio Grande, in the vicinity of Matamoras, and presumably in the jurisdiction of the alcalde of that place, and not in the jurisdiction of the alcalde of Reynosa. On the other hand, it appears that the Abajo was surveyed for Pedro Villareal in 1832, and that surveys were made in that vicinity for the other parties mentioned in said letters, and that Pedro

Villareal, through his employés, had possession of the Abajo until some time between 1850 and 1860.

[19] It is also urged as a reason why these letters should not have been admitted in evidence that they were hearsay. This is true. While the general rule is that hearsay evidence is not admissible, there are many exceptions to the rule, such, for instance, as dying declarations, family history, statements against interest, entries in books of account, etc. The rule is founded upon good reasons, well known to the profession, and so also are the exceptions; each is salutary, and should be enforced when the reason therefor exists.

The principal grounds for exception to the rule that hearsay evidence is not admissible are necessity, as where the witness is dead, and circumstantial guaranty of trustworthiness. Wigmore on Evidence, § 1425. Both of these grounds exist in the present case. If the parties who wrote these letters in 1832–1834 were then old enough to be officials, it is a reasonable presumption that they are dead. The letters were written in discharge of official duties, about matters in which the writers do not appear to have had any personal interest. These facts are sufficient guaranty to make a prima facie case of the truthfulness of the statements contained in the letters.

Finding no reversible error of record, the judgment of the trial court is affirmed.

Affirmed.

### On Motion for Rehearing.

In order to make corrections in our findings of fact, and to file additional findings of fact as requested by appellants, and also to correct an error in which we fell on account of a misconstruction of the pleadings of Jno. G. Kenedy & Co. as to disclaimer, we withdraw our opinion on motion for rehearing filed herein March 29, 1917, and substitute this opinion in lieu thereof.

We correct our fourteenth finding of fact so as to read as follows:

In 1869, F. A. Blucher, county surveyor of Cameron county, by virtue of the act of 1852, surveyed El Paistle and Las Barrosas for Mifflin Kenedy, who claimed to be the owner of said surveys, and who applied for and received from the land commissioner patents to said surveys as surveyed by said Blucher. In 1861 Blucher surveyed the Panaschal, which joins La Parra on the east. In making these surveys he ran the west, south, and east lines of La Parra. The southeast corner of La Parra was then, and is now, well known and undisputed. The record does not show whether or not La Parra or Arriba have been patented.

By request of appellants, we also make the following additional findings of fact:

The Kenedy Pasture Company has rendered and paid taxes on both the El Paistle and Las Barrosas grants as patented from the year 1883 continuously down to the trial of this cause.

On November 11, 1886, Francisca Balli Garza and her husband, Alejos Aleman, for the consideration of $1, deeded to Bernardo Yturria the El Paistle grant, describing the same as beginning at a point on Olmos creek, called "El Paso Ancho de la Carreta," being the common corner of El Paistle and La Parra; thence S. 300 cordelas; thence W. 167 cordelas, 10⅔ vrs.; thence N. to Olmos creek; thence easterly, with meanders of said creek, to the beginning, containing five square sitios or leagues of land; reciting in said deed that Francisca Balli Garza inherits from her father, Juan Antonio Balli Cavazos, deceased, the original grantee, and of whom she, the said Francisca Balli Garza, is the only surviving child and only heir; which deed was filed for record in Cameron county, Tex., November 13, 1886.

On March 3, 1887, Bernardo Yturria, for the recited consideration of $3,000, deeded, to the Kenedy Pasture Company, El Paistle, describing the same as bounded on the north by Los Olmos creek, on the east by the tract of land known and called La Parra, on the south by Las Barrosas, which deed was filed for record in Cameron county, March 4, 1887.

On May 18, 1904, Francisca Balli Garza, and her husband, Alejos Aleman, deeded to the Kenedy Pasture Company, for the recited consideration of $1 and other good, valuable, and sufficient considerations, El Paistle, the same having been patented by the state of Texas, and bounded on the north by Los Olmos creek, on the east by La Parra, and on the south by Las Barrosas, which deed was filed for record by J. W. Webb, county clerk (county not given), July 10, 1905.

The Mexican appellants and interveners in this cause, or their ancestors, on December 22, 1904, filed suit in the form of trespass to try title in the district court of Cameron county, against the Fants and Sullivan, Mrs. Jeffers, and H. C. Tindale and wife, for the recovery of the lands of the Santa Rosa de Abajo grant to Pedro Villareal, describing same as bounded on the east by El Paistle and Las Barrosas grants, on the south by Las Barrosas, and on the west by Santa Rosa de Arriba, and on the north by Olmos creek, and said cause, by agreement of parties, was transferred to Travis county and consolidated with this case.

On October 5, 1911, the same parties filed suit in the district court of Willacy county against the Crockers and others for the recovery of the Santa Rosa de Abajo lands, describing the same as above stated, and the venue of that cause was also changed to Travis county and consolidated with this cause.

On the 18th of November, 1914, the Kenedy Pasture Company filed suit in the district court of Willacy county against M. L. Crocker for recovery of 270 acres of land, as part of Las Barrosas, which suit was also trans-

ferred to Travis county, and consolidated with this cause.

Appellants request us to make 69 additional findings of fact, consisting largely of the testimony given in this cause, and covering the greater portion of the statement of facts, which consists of 739 pages. Our original findings of fact as herein corrected, and the additional findings of fact herein made, cover all of the facts established by the evidence which we deem material to the issues herein involved, for which reason we decline to make further additional findings of fact as requested by appellants.

[20] Appellees, the Fant heirs, ask us to sustain their eighth cross-assignment of error, which is as follows:

"The court erred in its seventh conclusion of fact in finding as follows: 'At the time when F. J. Parker located his surveys upon the Santa Rosa de Abajo tract of land he had notice that Judge Jas. B. Wells had seen what purported to have been a grant of said Santa Rosa de Abajo tract issued to Pedro Villareal by the governor of Tamaulipas, Mexico, on the 12th of April, 1848, and that said grant appeared on its face to be an original grant'; for the reason that said finding is contrary to, and wholly unsupported by, the evidence, in that it nowhere appeared in the evidence that F. J. Parker had any character of notice of these matters, and it affirmatively appears that, on the only occasion a location by F. J. Parker on the Abajo tract was discussed between him and Judge Jas. B. Wells, the latter, according to his own testimony, told F. J. Parker that he did not know anything about the status of the title, and could not say anything about it, and J. J. Cocke, the only other witness who testified with reference to this matter, testified that he did not recollect Judge Wells telling Parker that he had seen a grant and survey of the Abajo tract."

We sustain said assignment of error. While Judge Wells testified that Col. Crafts left the original grant of the Abajo in his office, and that he examined the same, and that the field notes attached thereto were signed by Canales, whose signature he recognized by frequently having seen it attached to field notes, he did not testify that he told Parker that he had seen said grant. Judge Wells testified on this point as follows:

"I inferred from what I heard—I knew nothing outside of that—that Parker wanted Mr. Cocke to locate and survey some land certificates on the Santa Rosa de Abajo grant, and that Mr. Cocke objected to doing it on account of knowing of this Santa Rosa de Abajo grant on it. The language that took place and what went back and forth—the conversation was principally between them—and I just sat there, and about the only thing I said about it was that I did not know about the status of the title and could not say anything about it."

[21] Appellants complain that we ignore the call for Trancas Motte on the west line of La Parra survey. The trial court evidently gave precedence to the call for Motte de Tio Culas over the call for Trancas Motte, and we think properly so, for the reason that Tio Culas Motte was a well-known natural object when the original survey was made, whereas Trancas Motte is only a name given by the surveyor. "Trancas" means a bar across something, and, as applied to a line, it means that the line runs through the motte. A motte could not be "trancas" (across) a line before the line was run. The Culas Motte is found at the proper distance from the southwest corner of La Parra as located by Blucher. Some stumps claimed to be those of Trancas Motte are found on the east line of La Parra as run by Cocke, but lacking 600 varas of being the proper distance from its northwest corner as located by that surveyor and as claimed by appellants. The country is shown to be full of stumps.

Appellants Kenedy & Co. assume in their motion for rehearing that we rendered judgment against them for the sections and parts of sections situated upon the east side of Abajo as located by it upon the ground, that it had disclaimed as to same. It did not disclaim as to these lands, but, on the contrary, claimed them as a part of El Paistle. What we hold is that, even if we were in error as to the boundary of El Paistle, the Kenedy Pasture Company is estopped to claim these lands as part of El Paistle as against innocent purchasers, for the reason that Mifflin Kenedy, under whom it claims, had El Paistle surveyed and patented so as to exclude these lands from said survey.

[22] The state in its motion for a rehearing insists that we erred in affirming the judgment of the trial court, as against it, for the sections and fractional sections of land lying east of the east line of the Abajo survey, as the same is described in the answer of Jno. G. Kenedy et al.; the contention in this regard being that said answer is in effect a disclaimer of all lands not included within the boundaries of the Abajo as described by said appellants.

Article 7752, R. S., reads as follows:

"Where the defendant claims part of the premises only, the answer shall be equivalent to a disclaimer of the balance."

A plea of not guilty and a disclaimer of all of the land sued for are so inconsistent that the plea of not guilty will be disregarded. Herring v. Swain, 84 Tex. 523, 19 S. W. 774. Where a defendant pleads not guilty, and also specially pleads his title to all of the lands in controversy, this is equivalent to disclaiming any title to any of the land sued for, except that which he specially pleads. Hayes v. Gallaher, 21 Tex. Civ. App. 88, 51 S. W. 280. These are the strongest cases in favor of the state's contention to which our attention has been called or which are known to us.

In Stipe v. Shirley, 33 Tex. Civ. App. 223, 76 S. W. 307, and Keyser v. Muesback, 77 Tex. 64, 13 S. W. 967, cited by the state, it does not appear that there was any plea of not guilty.

In Converse v. Langshaw, 81 Tex. 275, 16 S. W. 1031, it clearly appears from the pleadings contained in the original record (which we have this day examined) that defendant's plea of not guilty related only to so much of the land sued for as might be found to be

within the boundary of his survey which he sets out by his field notes. The suit was in fact a boundary suit, and the issue was as to whether there was any conflict between a 640-acre survey claimed by plaintiff and a 320-acre survey claimed by defendant. The evidence showed a small conflict, and it was as to this that the defendant pleaded not guilty, and also improvements and good faith.

In Dodge v. Richardson, 70 Tex. 209, 8 S. W. 30, defendant distinctly disclaimed except as to a certain portion of the land sued for; and this is true also as to defendant's plea in York v. Lumber Co., 169 S. W. 187.

In the instant case Kenedy et al. pleaded not guilty, and by way of special plea alleged that the state ought not to recover, as to a portion of the land sued for by it, because the same was included within the boundaries of the Abajo survey, which boundaries they set out; that said Abajo was a valid grant under the laws of Mexico, and under the treaty of Guadalupe Hidalgo, and that they were the owners of said grant.

The object of pleading is to advise the opposite party what is expected to be proven as showing the right of recovery or a valid defense. In so far as pleadings by failing to distinctly allege the facts relied upon set snares and pitfalls for the opposite party, they ought to be strictly construed against the pleader, but, where the pleadings cannot possibly lead to surprise in the introduction of evidence, they ought to be liberally construed in the interest of justice. We think the article of the statute above quoted means that when a party in trespass to try title answers that he owns a part of the land, and does not indicate that he claims any except such part, it is to be construed as a disclaimer of the balance of the land sued for. This is common sense. When a man says to another, "I own a certain tract of land," and the other replied, "I own a certain part of that land," it means that he does not claim to own any except the part which he specifies.

In the instant case the real issue, aside from innocent purchaser and estoppel, was as to the validity of the Abajo grant. Incident to this was the issue of boundary, for the reason that if the Abajo grant, conceding its validity, was located as claimed by the state and the other appellees, the owner of the Abajo grant had no claim to a tier of sections on the west of the tract sued for by the state. It clearly appears from the pleadings herein that Kenedy et al. were claiming that the Abajo was a valid grant, and that they were the owners thereof wherever the same might be located. Their description of the boundary of said grant amounted, in effect, to a claim by them of the tier of sections upon the east side of the tract sued for by the state. The state could not have been surprised by the evidence introduced for the purpose of establishing the boundaries of the Abajo about a mile further west than

where Kenedy & Co. alleged the same to be, for the reason that such location was contended for by the state, and, as we hold, was established by the state's evidence, against the contention of Kenedy & Co., as to said location. If the Abajo is a valid grant, and Kenedy & Co. are the owners thereof, justice demands that they should recover the same, except as against innocent purchasers, or persons establishing title thereto by limitation, and we do not think that they are barred from such recovery by the fact that they were mistaken as to the boundaries of said grant. It should be remembered that this is not a suit by the alleged owners of the Abajo as plaintiffs, claiming certain land and describing the location thereof in their petition. They occupy this position in their cross-bill as against the purchasers of the state, but as to the state they are simply defendants asserting the validity of the Abajo grant, and contesting the state's claim as to the boundary thereof.

Appellants insist that the east line of the Arriba, which we hold to be the west line of the Abajo, was located by the judgment in Sullivan v. State, 41 Tex. Civ. App. 89, 95 S. W. 645, at about where they claim it to be. If so, we think that it was erroneously located. That judgment did not locate the lines of the Abajo, which is the issue here, and we do not think that the judgment in that case estops the state from insisting upon the true location of the Abajo. We infer from the opinion in the Sullivan Case, supra, that the court held that there was a vacancy between the Arriba and the Abajo. If so, the court was evidently of the opinion that the Abajo was located about where the judgment of the trial court in the instant case locates it, which judgment we find is sustained by the evidence.

To our minds, the most serious question urged by the appellants against our decision herein is as to innocent purchasers. On the other hand, we think there is much force in the cross-assignment of appellees that, in view of the facts, the title of Villareal was at most an inchoate equitable title, and, as he and his heirs never occupied the same later than 1850 or 1860, that they were thereafter citizens of a foreign country, that they made no effort to prove up their claim under the act of 1850, and did not bring suit against the state to establish the same, as they might have done under several acts of the Legislature of this state, and have never paid any taxes on said land, it ought to be held that they had abandoned their claim to said grant. However, after due consideration, we have concluded to stand by our original decision herein as to these issues.

For the reason that we do not believe that any error appears of record in this case, we set aside the judgment rendered by us on motion for rehearing filed herein on March 29, 1917, in so far as it relates to recovery by the state, and overrule appellants' motion

for rehearing in all other respects, and we overrule all other motions for rehearing, and reaffirm our original decision herein.

Motion overruled.

Judgment of trial court affirmed.